Jennifer A. Lenze, CA Bar # 246858
Amanda D. McGee, CA Bar # 282034
**LENZE LAWYERS, PLC.**
1300 Highland Avenue, Suite 207
Manhattan Beach, CA 90266
Telephone: (310) 322-8800
Facsimile: (310) 322-8811
jlenze@lenzelawyers.com
mcgee@lenzelawyers.com

ELIZABETH A. FEGAN (*pro hac vice* to be filed)
beth@feganscott.com
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: 312.741.1019
Facsimile: 312.264.0100

JONATHAN D. LINDENFELD (*pro hac vice* to be filed)
jonathan@feganscott.com
FEGAN SCOTT LLC
140 Broadway, 46th Floor
New York, NY 10005
Telephone: 332.216.2101
Facsimile: 917.725.9346

*Attorneys for Plaintiff and*
*Proposed Class Counsel*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAMTIN ZAKIKHANI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HYUNDAI MOTOR COMPANY, HYUNDAI MOTOR AMERICA, KIA MOTORS CORPORATION, and KIA MOTORS AMERICA, INC.,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   JURISDICTION ................................................................................................. 5

III.  PARTIES ........................................................................................................... 6

IV.   SUBSTANTIVE ALLEGATIONS ................................................................... 7

  A.   Hyundai and Kia Become One of the Most Popular Automakers in the United States. ............ 7

  B.   ABS Modules and HECUs are intended to prevent car wheels from locking and cars from skidding out of control. .......................................................... 10

  C.   Defendants manufactured and sold hundreds of thousands of Class Vehicles with a deadly Defect. .................................................................................. 11

  D.   The Defect caused Plaintiff's 2007 Hyundai Entourage to catch fire while parked in his garage, threatening his family's life, and causing damage to his home. ............................ 28

  E.   Defendants had knowledge of the Defect for years prior to issuing any recalls. .................... 33

  F.   Defendants issue inadequate and incomplete Recalls, leaving hundreds of thousands of dangerous Class Vehicles on the road. ........................................ 38

  G.   Defendants falsely claim to offer the best warranty program in the nation. ........................... 46

V.    TOLLING OF STATUTES OF LIMITATIONS ........................................... 47

VI.   CALIFORNIA LAW APPLIES TO NATIONWIDE CLAIMS .................... 48

VII.  CLASS ALLEGATIONS ................................................................................ 49

VIII. CAUSES OF ACTION .................................................................................... 51

  VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT ....................... 51

  VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ...................... 53

  VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW ........................ 54

  VIOLATIONS OF THE SONG-BEVERLY ACT ................................................ 56

  UNJUST ENRICHMENT ...................................................................................... 57

  BREACH OF IMPLIED WARRANTY ..................................................................... 58

  VIOLATION OF STATE CONSUMER PROTECTION ACTS ..................................... 60

  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ............................ 63

IX.   REQUEST FOR RELIEF ................................................................................ 66

X.    DEMAND FOR JURY TRIAL ...................................................................... 66

Plaintiff Ramtin Zakikhani ("Plaintiff"), individually and on behalf of all those similarly situated, complains of Defendants Hyundai Motor Company ("HMC"), Hyundai Motor America ("Hyundai America," and collectively, with HMC "Hyundai"), KIA Motors Corporation ("KMC"), and KIA Motors America, Inc. ("Kia America," and collectively, with KMC "Kia") (Kia and Hyundai are collectively referred to as "Defendants"), based upon his personal knowledge as to facts specific to him and based upon the investigation of counsel in all other respects, as follows:

## I.    INTRODUCTION

1.    An automobile purchase is one of the most expensive and important decisions consumers make. Consumers rely upon auto-makers' superior knowledge to manufacture cars that are safe and free from defects. Defendants readily acknowledge that "[a]ny fault in your car can affect your safety."[1] Should a manufacturer learn of any safety defects in their vehicles, it is imperative and a legal requirement for it to immediately warn the public and provide a comprehensive remedy.

2.    Despite these important duties, Defendants knowingly failed to recall hundreds of thousands of Class Vehicles[2] containing a potentially deadly defect—putting countless lives at risk from approximately 2006 to this day.

3.    In April 2011, a public complaint was filed with the National Highway Traffic Safety Administration ("NHTSA") by an owner of a 2010 Hyundai Elantra.[3] The owner reported that his or her "6-month old Hyundai Elantra Touring caught fire after sitting in [his or her] driveway for nine hours." Unable to identify a cause for why a brand-new vehicle would spontaneously erupt in flames, a forensic engineer was retained to determine the cause of the vehicle-fire.

4.    Upon completion of the investigation, public complaint states that the engineer "concluded that the fire was electrical and originated in the engine compartment." At that time, Defendants had yet to issue any recalls or publicly acknowledge any defect in the Class Vehicles that may result in spontaneous engine compartment fires.

---

[1] http://www.kia.com/worldwide/experience_kia/rnd/performance.do (last accessed July 16, 2020).

[2] The Class Vehicles are: 2007-2010 Hyundai Elantra; 2009-2011 Hyundai Elantra Touring; 2007-2008 Hyundai Entourage; 2007 Hyundai Santa Fe; 2006-2011 Hyundai Azera; 2006 Hyundai Sonata; 2006-2010 Kia Sedona; 2007-2009 Kia Sorento; and 2008-2009 Kia Sportage.

[3] NHTSA ID No.: 10398944.

5.      The forensic engineer's conclusion was spot-on.  The 2010 Hyundai Elantra, and each Class Vehicle, contains potentially deadly defects in components installed in the vehicle's engine compartment: the Anti-Lock Brake System ("ABS") modules or Hydraulic Electronic Control Unit ("HECU"). Specifically, the ABS modules and HECUs installed in the Class Vehicles allow moisture to accumulate within the parts which also maintain an electrical charge even when the vehicle is off. Due to the moisture entering the electrified ABS module or HECU, a short circuit is formed which creates a high likelihood that a fire will erupt in the vehicle's engine compartment.  (Referred to herein as the "Defect.").

6.      Since the first NHTSA complaint was filed in 2011, scores of Class Vehicle owners have reported horrifying accounts of their vehicles erupting in flames, including stories of entire homes being burned to a crisp, neighboring properties catching fire, and individuals narrowly escaping their burning homes. Indeed, on March 26, 2019, while sitting in his living room, Plaintiff was disturbed in the middle of the night by a car horn coming from his garage and thick black plume of smoke emanating from his 2007 Hyundai Entourage.



CLASS ACTION COMPLAINT



*Plaintiff's 2007 Hyundai Entourage on the night
the Defect caused it to erupt in his garage.*

7.     Defendants were aware of the Defect long before they ever acknowledged its existence. Defendants are experienced (and tout themselves as such) in the design and manufacture of consumer vehicles and conduct durability tests on all of its components, including ABS modules and HECUs, to verify the parts are free from defects and comply with their specifications.

8.     Moreover, Defendants have access to numerous sources of reports of Class Vehicle failures caused by the Defect, including their own records of customer complaints, dealership repair records, warranty claims, and NHTSA complaints.

9.     As part of a 2014 NHTSA Consent Decree entered against Hyundai for failing to timely warn consumers of a known safety defect in its HECUs, Hyundai is also obligated to maintain a Technical Committee to review all potential defects and consider whether safety recalls are necessary.

10.     In the face of numerous terrifying reports of unexplainable and spontaneous engine compartment fires in Class Vehicles, Defendants knowingly waited years to issue recalls for the defective vehicles and disclose the Defect.

11.     On November 4, 2016, Kia announced for the first time that some of its vehicles, 2008 and 2009 Kia Sportage SUVs, suffered from the Defect which allows water to enter the HECU, creating a risk of engine compartment fires (the "2016 Recall"). Defendants, however, did not disclose that the Defect also included the HECU remaining electrically charged at all times or offer to fix this aspect of the Defect.  Nor did Defendants warn that the same Defect is found in multiple other Hyundai and Kia

3

vehicles.

12.     Two years after Kia acknowledged the Defect, on January 9, 2018, Hyundai reported that 2006-2011 Hyundai Azera and 2006 Hyundai Sonata also contained the Defect (the "2018 Recall"). Unlike the 2016 Recall, Hyundai acknowledged this time that the Defect and risk of fire are related to the ABS module remaining charged at all times. However, Hyundai refused to address the moisture entering into the ABS module or the risk of engine compartment fires while the car is on, and did not warn that the Defect was also found in hundreds of thousands of additional vehicles produced by Defendants.

13.     Finally, in February 2020, Defendants revealed that Defect was also present in more than 700,000 vehicles, comprised of: 2007-2010 Hyundai Elantra; 2009-2011 Hyundai Elantra Touring; 2007-2008 Hyundai Entourage; 2007 Hyundai Santa Fe; 2006-2010 Kia Sedona; and 2007-2009 Kia Sorento (the "2020 Recall", and together with the 2016 Recall and 2018 Recall, the "Recalls").  As part of the 2020 Recall, Hyundai simply offered the same inadequate "remedy" as provided in the 2018 Recall.

14.     Critically, Defendants' Recalls of the Class Vehicles do not alleviate the risk of spontaneous engine compartment fires. Defendants offered two forms of "remedies" for the Defect. The first "remedy" (proposed in the 2016 Recall) merely replaces the connector cover of the defective component, and the other "remedy" (proposed in the 2018 and 2020 Recalls) installs a relay in the fuse box to remove the electrical current from the ABS module or HECU when the car is turned off.  These remedies, however, are just band-aids for a deadly Defect which requires a comprehensive fix to make these vehicles safe. The proposed "remedies" do not prevent ABS modules and HECUs from erupting while someone is driving a Class Vehicle—a fact that Hyundai has acknowledged, nor do they adequately prevent the components from collecting moisture which causes short-circuits in the first instance.

15.     Defendants' abhorrent disregard for the safety of its consumers came at a total surprise to Plaintiff and other Class Members who were repeatedly told by Defendants that their "cars undergo thousands of hours of examination and it's not just engine performance that is under scrutiny" and that the manufacturers place an emphasis on "quality and durability." Moreover, Plaintiff and other Class

Members were outraged to learn that despite advertisements that Defendants offered "industry lead[ing]" warranty programs and "America's Best Warranty," Defendants would do all they could to conceal the Defect and skirt their obligations.

16. Had Plaintiff and other Class Members known of the Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles or would have paid substantially less for them.

17. As a result of Defendants' unfair, deceptive, and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiff, have suffered an ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices committed by Defendants caused Plaintiff and the members of the Class damages, including but not limited to, loss of value, loss of use of the vehicles, and repair costs.

18. Accordingly, Plaintiff brings this action to redress Defendants' misconduct. Plaintiff seeks recovery of damages and a repair under state consumer-protection statutes and implied warranties, and reimbursement of all expenses associated with the repair or replacement of the Class Vehicle and damage caused by the Class Vehicles.

## II.    JURISDICTION

19. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§1332(d)(2) and (6) because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

20. Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants transact substantial business and are headquartered in this district. Defendants advertised in this district and received substantial revenue and profits from sales and/or leases of the Class Vehicles in this district. Defendants also have research and development offices in this district. Therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

21. This Court has personal jurisdiction over Defendants by virtue of their transactions and business conducted in this judicial district, and because Defendants are headquartered in California.

Defendants have transacted and done business, and violated statutory and common law, in the State of California and in this judicial district.

### III.   PARTIES

**A.   Plaintiff**

22.    Plaintiff is a resident of Sarasota, Florida. Plaintiff purchased a 2007 Hyundai Entourage minivan, VIN Number: KNDMC233576041791, from Hyundai of Newport, located at 11133 West Main Road, Middletown, Rhode Island, on June 10, 2008. Hyundai of Newport is part of Hyundai's network of authorized dealers across the United States, and is promoted on Hyundai's website:[4]



23.    Plaintiff's vehicle was "Certified Pre-Owned" by Hyundai, which included a 10-year/100,000-mile powertrain warranty for his "peace of mind." Additionally, Plaintiff paid $1,400 for an extended "Platinum" bumper-to-bumper warranty, which covers "any [] mechanical breakdown," including "ABS component parts including control processor/module." Plaintiff purchased the minivan from Defendants because he believed that the vehicle was safe for him and his family.

---

[4] https://www.hyundaiusa.com/us/en/dealer-locator?&chid=sem&fb=&CID=20166438&PID=202442677&CRID=0&SID=4075918&AID=402292811&ds_query=%2Bhyundai+%2Bdealer&ds_rl=1280785&ds_rl=1277805&ds_rl=1277805&gclid=EAIaIQobChMIuOP398_S6gIVgZ6zCh0o4QgVEAAYASAAEgLD7fD_BwE&gclsrc=aw.ds (last accessed July 16, 2020).

**B.     Defendants**

24.     Defendant Hyundai America is a publicly traded California corporation with its principal place of business in Fountain Valley, California. Hyundai America also maintains a 4,300-acre testing facility in Irwindale, California, and an engineering facility in Detroit, Michigan.  Hyundai America is a subsidiary of HMC and is actively engaged in manufacturing, assembling, marketing, and distributing Hyundai vehicles sold in California and the rest of the United States.

25.     Defendant Kia America is a California corporation with its principal place of business in Irvine, California. Kia America is a subsidiary of KMC and is actively engaged in manufacturing, assembling, marketing, and distributing Kia vehicles sold in the United States.

26.     Defendant HMC is a South Korean corporation with its headquarters located in Seoul, South Korea. Hyundai is the parent corporation of Hyundai America and owns a 33.88% stake in Kia.

27.     Defendant KMC is a South Korean corporation with its headquarters located in Seoul, South Korean. Kia is the parent corporation of Kia America.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.  Hyundai and Kia Become One of the Most Popular Automakers in the United States.

28.     Established in South Korea in 1967, Hyundai first started selling vehicles in the United States in 1986. Since that time, Hyundai has become one of the largest automakers in the United States and around the world.

29.     Kia was founded in 1944 manufacturing bicycles and motorcycles and is Korea's oldest manufacturer of motor vehicles. Kia first imported its vehicles to the United States in 1992.

30.     In 1999, Hyundai announced that it had acquired a controlling interest in Kia, and that Kia would obtain an ownership interest in approximately twenty-two (22) Hyundai subsidiaries. In subsequent years, Hyundai divested a portion of its interest and currently controls approximately 34% of Kia.

31.     Today, over half the cars Hyundai sells in the United States are designed and manufactured domestically at its "technologically sophisticated manufacturing facility in Montgomery, Alabama, engineering facilities in Michigan, [and] design, research, and testing grounds in California."[5]

---

[5] https://www.hyundainews.com/en-us/about-us (last accessed July 16, 2020).

In total, Hyundai employs approximately 5,000 people at these facilities, and an additional 20,000 employees at U.S. dealerships.

32.     Through its network of more than 820 dealerships nationwide, Hyundai sells and services its vehicles, including the Hyundai Elantra (Hyundai's best-selling model), Hyundai Santa Fe, Hyundai Tucson, and Hyundai Accent.  Likewise, Kia sells and services a complete line of vehicles in the U.S. through its own network of over 700 dealers.

33.     Collectively, Defendants are the world's fifth-largest automaker. Defendants reported global sales of 7.19 million vehicles in 2019, up from approximately 900,000 in 2010.[6]

34.     Within the United States alone, Hyundai sold an average of 617,420 vehicles per year since 2006, approximately 4% of the total U.S. market:[7]

| Year | Vehicles Sold | Market Share (%) |
| --- | --- | --- |
| 2006 | 455,520 | 2.75 |
| 2007 | 467,009 | 2.89 |
| 2008 | 401,742 | 3.03 |
| 2009 | 435,064 | 4.17 |
| 2010 | 538,228 | 4.64 |
| 2011 | 645,691 | 5.05 |
| 2012 | 703,007 | 4.85 |
| 2013 | 720,783 | 4.63 |
| 2014 | 725,718 | 4.39 |
| 2015 | 761,710 | 4.36 |
| 2016 | 768,057 | 4.38 |
| 2017 | 664,943 | 3.86 |
| 2018 | 667,634 | 3.85 |
| 2019 | 688,771 | 4.03 |

---

[6] https://www.reuters.com/article/hyundai-motor-sales/hyundai-kia-report-2019-global-sales-of-7-2-mln-vehicles-miss-target-idUSS6N23A02C#:~:text=6%20months%20ago-,Hyundai%2C%20Kia%20report%202019%20global%20sales,7.2%2mln%20vehicles%3B%20miss%20target&text=SEOUL%2C%20Jan%202%20(Reuters),target%20of%207.6%20million%20vehicles (last accessed July 16, 2020); https://www.motortrend.com/news/hyundai-kia-set-new-records-2010-sales-538228-356268-vehicles-respectively-21926/ (last accessed July 16, 2020).

[7] https://carsalesbase.com/us-hyundai/ (last accessed July 16, 2020).

35.     Over the same time period, Kia sold an average of 483,293 vehicles per year, or approximately 3.1% of the U.S. market:[8]

| Year | Vehicles Sold | Market Share (%) |
|------|---------------|------------------|
| 2006 | 294,302 | 1.78 |
| 2007 | 305,473 | 1.89 |
| 2008 | 273,397 | 2.06 |
| 2009 | 300,063 | 2.88 |
| 2010 | 366,268 | 3.16 |
| 2011 | 485,492 | 3.8 |
| 2012 | 557,599 | 3.85 |
| 2013 | 535,179 | 3.43 |
| 2014 | 580,234 | 3.51 |
| 2015 | 625,818 | 3.58 |
| 2016 | 647,598 | 3.69 |
| 2017 | 589,668 | 3.42 |
| 2018 | 589,673 | 3.4 |
| 2019 | 615,338 | 3.6 |

36.     Additionally, a recent report by McKinsey & Company found that over twice as many second-owner used vehicles are sold in the United States each year compared to new vehicles.[9]

37.     Defendants have been able to transform themselves into such large players in the U.S. auto-market based on its assurances to consumers of care and quality. For example. Hyundai touts itself as being "committed to becoming a lifetime partner in automobiles and beyond[.]"[10] In its public statements, Hyundai poses a question: "What if [a car company] cracked the entire industry wide open, peered more deeply into it, spread out all its parts, and questioned their every detail?... At Hyundai, we ask ourselves the important questions every day. And, every day, we seek the best answers. It's what makes us grow as a car company. It's what makes us Hyundai."[11]

38.     Likewise, Kia advertises that it "believe[s] in the outstanding quality and durability of

---

[8] https://carsalesbase.com/us-kia/ (last accessed July 16, 2020).

[9] https://www.mckinsey.com/industries/automotive-and-assembly/our-insights/used-cars-new-platforms-accelerating-sales-in-a-digitally-disrupted-market# (last accessed July 16, 2020).

[10] https://www.hyundai.com/worldwide/en/company/news/news-room/news/hyundai-motor-reports-december-2019-global-sales-0000016366 (last accessed July 16, 2020).

[11] https://www.hyundainews.com/en-us/about-us (last accessed July 16, 2020).

CLASS ACTION COMPLAINT

every new Kia that rolls off the assembly line" and that "[f]rom design to technology, materials to safety features, Kia continues to innovate[.]"[12]

**B.      ABS Modules and HECUs are intended to prevent car wheels from locking and cars from skidding out of control.**

39.     Cars today have become sophisticated technological and mechanical machines that rely upon electronic controls to regulate numerous safety features. One such feature is the elimination of brake lockups through ABS modules.

40.     Developed in the 1980s, NHTSA now requires that all vehicles sold in the United States include anti-lock brakes, which are central to a vehicle's electronic stability control.[13]

41.     An ABS is an automatic system that prevents the vehicle from skidding when the driver applies the brakes and when the brakes are not applied.

42.     An ABS has two key components: the ABS wheel sensors and ABS control module. ABS control modules are made up of microprocessors that run diagnostic checks on each component within the ABS.[14] When a driver applies the brakes, the wheel sensors record each individual wheel's speed at that moment which is then transmitted to the control module. If the ABS module detects that the driver is applying the brakes too strongly, it adapts the braking pressure in order to prevent the wheels from locking and the car from skidding out of control.

43.     ABS modules are typically located in the vehicle's engine compartment, while the wheel speed sensors are attached to the tires, near the brake rotors. The ABS module is connected to and powered by the vehicle's electrical fuse box.

44.     Below is a diagram of a car's entire ABS, including the control module:

---

[12] https://www.kia.com/us/en/why-kia (last accessed July 16, 2020).
[13] https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/esc_fr_03_2007.pdf (last accessed July 16, 2020).
[14]https://www.cars.com/auto-repair/glossary/abs-control-module/#:~:text=The%20ABS%20control%20module%20is,lock%20up%20and%20start%20skidding (last accessed July 16, 2020).



45.     The final component of an ABS is the ABS warning light located on the driver's dashboard. The ABS warning light is supposed to indicate when the ABS control module is not functioning properly or another ABS related issue is detected, such as a failing wheel sensor. Depending on the vehicle and the issue detected, brake function may be impaired if the warning light is flashing.

46.     If an ABS warning light is triggered, authorized mechanics possess various diagnostic tools to precisely locate the issue in the ABS.

47.     Additionally, certain car manufacturers, including Kia, install a HECU in their vehicles, which controls the ABS, electronic stability control system, and traction control system.

48.     Both the ABS and HECU have electrical currents running through them, and thus, must be sealed in order to avoid moisture entering into the circuits. A proper and durable seal is necessary to avoid corrosion on the module's circuit board, which can lead to electrical short circuit fires.

**C.     Defendants manufactured and sold hundreds of thousands of Class Vehicles with a deadly Defect.**

49.     The ABS modules found in Hyundai Class Vehicles and the HECUs found in the Kia Class Vehicles are defective in two regards. First, the ABS modules and HECUs remain charged with an electrical current when the car is on and off. Second, the ABS modules and HECUs allow moisture to enter and/or accumulate within the electrified components.

11

50.     These two defects create a potentially lethal situation where moisture can enter the electrical circuit of the ABS module or HECU while the unit is energized, creating a short circuit.  Once the short circuit occurs, there is a high likelihood that a fire erupts in the engine compartment of each Class Vehicle.

51.     Most worrisome about the Defect—and precisely why it is so dangerous—is that it still poses a fire risk when the car is not on and it has been parked for days. Thus, the Defect poses a serious risk to drivers, as well as all property owners in the vicinity of any parked Class Vehicle which can erupt at any moment, without notice.

52.     Complaints submitted to NHTSA reveal shocking reports of Class Vehicles catching on fire without explanation, including while cars were off and without collisions.

53.     Below are just a few exemplar complaints filed with NHTSA related to non-collision fires in Class Vehicles caused by the Defect:[15]

- 2010 Hyundai Elantra
  - NHTSA ID No.: 10536612[16]
  - Filed:  August 22, 2013
  - Summary of Complaint:
    - I PUT MY 2010 HYUNDAI ELANTRA IN THE GARAGE ABOUT 11:00 PM ON SUNDAY NIGHT AUGUST 11, 2013. AT ABOUT 01:00 AM *ON AUGUST 12, 2013 I WAS AWAKENED WITH MY ENTIRE GARAGE ON FIRE. THE FIRE APPEARED TO COME FROM THE FRONT OF THE ELANTRA,* AS BOTH FRONT TIRES WERE COMPLETELY BURNED WITH ONLY STEEL WIRES WRAPPED AROUND WHEELS. ENGINE IS WARPED AND BURNED. ENTIRE FRONT END MELTED. *I LOST MY GARAGE AND CONTENTS ALONG WITH KAYAKS ON KAYAK TRAILER PARKED BESIDE GARAGE. BOTH NEIGHBORS' PRIVACY FENCES WERE BURNED DOWN BEHIND AND BESIDE MY GARAGE. THE ELANTRA BURNED COMPLETELY FROM THE FIRE.* NO STEERING WHEEL OR UPHOLSTERY LEFT. ALL ALUMINUM PARTS MELTED. RADIATOR MELTED. WIRES MELTED. EVEN THE BATTERY WAS MELTED. *TR
- 2007 Hyundai Elantra

---

[15] Emphasis added throughout unless stated otherwise.
[16] NHTSA complaints are publicly available online and searchable by NHTSA ID Number at https://www.nhtsa.gov/recalls.

- o NHTSA ID No.: 10548924
- o Filed: October 22, 2013
- o Summary of Complaint:
  - ▪ THE CONTACT OWNS A 2007 HYUNDAI ELANTRA. THE CONTACT STATED THAT THE VEHICLE BECAME ENGULFED IN FLAMES. THE FIRE DEPARTMENT WAS CALLED TO EXTINGUISH THE FIRE. A FIRE REPORT WAS NOT FILED HOWEVER, ***THE FIRE DEPARTMENT DID CONCLUDE THAT THE FIRE ORIGINATED FROM ELECTRICAL WIRES AND CABLES.*** THE VEHICLE WAS TOWED TO AN INDEPENDENT MECHANIC BUT HAD NOT BEEN INSPECTED OR REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FIRE.
- • 2007 Hyundai Elantra
  - o NHTSA ID No.: 10548829
  - o Filed: October 21, 2013
  - o Summary of Complaint:
    - ▪ ***VEHICLE CAUGHT FIRE AFTER SITTING OFF FOR 5 HOURS. FIRE DEPARTMENT DETERMINED THAT FIRE ORIGINATED IN ENGINE COMPARTMENT.*** NO INDICATION OF ARSON. ***PROBABLE CAUSE OF FIRE ELECTRICAL WITHIN ENGINE COMPARTMENT***. VEHICLE WAS IN EXCELLENT CONDITION, NEVER HAD ANY PROBLEMS AND WAS NEVER IN AN ACCIDENT***. NO RECALLS ISSUED FOR ELECTRICAL ISSUES IN ENGINE COMPARTMENT***. VEHICLE WAS PURCHASED NEW. NO PREVIOUS OWNER. *TR
- • 2007 Hyundai Elantra
  - o NHTSA ID No.: 10548924
  - o Filed: October 22, 2013
  - o Summary of Complaint:
    - ▪ TL* THE CONTACT OWNS A 2007 HYUNDAI ELANTRA. THE CONTACT STATED THAT THE VEHICLE BECAME ENGULFED IN FLAMES. THE FIRE DEPARTMENT WAS CALLED TO EXTINGUISH THE FIRE. A FIRE REPORT WAS NOT FILED HOWEVER, ***THE FIRE DEPARTMENT DID CONCLUDE THAT THE FIRE ORIGINATED FROM ELECTRICAL WIRES AND CABLES***. THE VEHICLE WAS TOWED TO AN INDEPENDENT MECHANIC BUT HAD NOT BEEN INSPECTED OR REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FIRE. THE APPROXIMATE FAILURE MILEAGE WAS 81,000.
- • 2007 Hyundai Elantra
  - o NHTSA ID No.:

- Filed: February 25, 2017
- Summary of Complaint:
  - ***COLD CAR CATCHES ON FIRE TOTAL LOST. WAS PARKED ON MY DRIVEWAY***
- 2008 Hyundai Elantra
  - NHTSA ID No.: 11139165
  - Filed: October 9, 2018
  - Summary of Complaint:
    - THIS LAST OCTOBER (2017), ***I WAS WOKEN UP BY NEIGHBORS INFORMING US THAT SMOKE WAS COMING FROM OUR GARAGE. THERE WAS A FIRE THAT STARTED IN THE ENGINE BAY OF MY 2008 (REGULARLY MAINTENANCED) HYUNDAI ELANTRA, AND TOTALED MY CAR, MY WIFE'S CAR, AND EXTENSIVELY DAMAGED MY GARAGE ($15,000 WORTH).*** THE VEHICLE SHOWED NO SIGNS OF IT ACTING STRANGELY AT ALL. THE FIRE DEPARTMENT CHALKED IT UP TO A ***"UNEXPLAINED ELECTRICAL FIRE" AS IT SEEMED LIKE IT STARTED FROM AROUND WHERE THE BATTERY WAS.***
- 2008 Hyundai Elantra
  - NHTSA ID No.: 11075623
  - Filed: March 1, 2018
  - Summary of Complaint:
    - ***CAR CAUGHT ON FIRE IN THE MIDDLE OF THE NIGHT, WHILE PARKED ON MY DRIVEWAY THE ENTIRE DAY.*** FIRE DEPARTMENT SAID THE CAUSE OF FIRE IS UNKNOWN BUT IT APPEARED TO HAVE START AT THE LEFT SIDE OF THE HOOD.
- 2008 Hyundai Elantra
  - NHTSA ID No.: 11311505
  - Filed: February 25, 2020
  - Summary of Complaint:
    - WHILE DRIVING HOME ON THE HIGHWAY AFTER A RAINY DAY, THE ABS LIGHT AND PARKING BRAKE LIGHTS CAME ON. I CHECKED THE PARKING BRAKE; IT WAS NOT ENGAGED. THE CAR SEEMED TO BE BRAKING ON ITS OWN AS I CONTINUED TO DRIVE. UPON ARRIVING HOME, THERE WAS SOME SMOKE COMING FROM THE LEFT FRONT WHEEL WHICH, AFTER IT DISSIPATED, I ASSUMED TO BE HOT, LOCKED UP BRAKES. ABOUT AN HOUR LATER MY HOUSEMATE CALLED TO ME FROM THE LIVING ROOM TELLING ME MY CAR WAS ON FIRE AND TO CALL 9-1-1. ***THE CAR WAS PARKED IN FRONT OF MY HOUSE, UNDER A MAGNOLIA TREE. THE FLAMES ENGULFED***

14

CLASS ACTION COMPLAINT

***THE ENTIRE FRONT END OF THE CAR, AND WERE ABOUT 4-5FT HIGH***. THE FIRE DEPARTMENT CAME AND HOSED THE CAR DOWN, TAKING ABOUT AN HOUR TO PUT OUT THE BLAZE. THE FRONT TIRES WERE FLAT, HAD MELTED, AND THE ENTIRE FRONT END WAS DECIMATED. THE DRIVERS SIDE OF THE WINDSHIELD HAD SHATTERED FROM THE FIRE, AND THE DRIVERS SIDE FLOORBOARD HAD BURNED THROUGH TO THE CABIN. THE ENTIRE CABIN IS DAMAGED FROM THE SMOKE, THE DRIVERS SIDE VISOR MELTED THROUGH. WHILE THERE IS DAMAGE TO THE ENTIRE FRONT END, ***THE DRIVERS SIDE IS WORSE, AND THE DRIVERS SIDE OF THE ENGINE COMPARTMENT APPEARS TO HAVE THE MOST DAMAGE. THERE IS NO VISIBLE FUSE BOX OR BATTERY AFTER THE FIRE***

- 2008 Hyundai Elantra
  - o NHTSA ID No.: 11258901
  - o Incident Date September 28, 2019
  - o Summary of Complaint:
    - ▪ MY DAUGHTER'S 2008 HYUNDAI ELANTRA WAS PARKED ON THE STREET OUTSIDE HER APARTMENT COMPLEX. ***THE FRONT OF THE CAR CAUGHT ON FIRE AFTER THE CAR HAD BEEN PARKED FOR ABOUT 30-35 HOURS.***

- 2009 Hyundai Elantra
  - o NHTSA ID No.: 11162908
  - o Filed: December 21, 2018
  - o Summary of Complaint:
    - ▪ STARTED THE CAR AND MOTOR/ENGINE CAUGHT FIRE. IT WAS THE MORNING OF 12/18/18. IT WAS PARKED IN FRONT OF MY MOMS HOUSE (ON THE STREET).

- 2011 Hyundai Elantra
  - o NHTSA ID No.: 11222746
  - o Filed: June 26, 2019
  - o Summary of Complaint:
    - ▪ TL* THE CONTACT OWNED A 2011 HYUNDAI ELANTRA. THE CONTACT STATED THAT ***THE VEHICLE CAUGHT FIRE WHILE PARKED IN THE FAMILY GARAGE***. THERE WERE NO INJURIES AND THE FIRE DEPARTMENT PUT OUT FIRE. A FIRE REPORT AND A POLICE REPORT WERE FILED. ***SMOKE FILLED THE HOME AND THE GARAGE DRYWALL CEILING HAD COLLAPSED AND BLACKENED THE INTERIOR OF THE GARAGE. THERE WAS EXTENSIVE SMOKE DAMAGE TO THE INTERIOR OF THE HOUSE***. THE VEHICLE WAS ENGULFED IN

FLAMES AND FULL OF WATER. THE FIRE STARTED ON THE DRIVER'S FRONT SIDE OF THE ENGINE. THE EXACT CAUSE HAD NOT BEEN DETERMINED AS OF YET. THE VEHICLE 'S WHOLE FRONT FROM THE ENGINE HAD BEEN BURNED OUT. ***THE GLASS EXPLODED AND THE VEHICLE WAS RIPPED OPEN USING A JAWS OF LIFE TOOL*** SO THE FIRE DEPARTMENT COULD PUT OUT THE FIRE FROM THE ENGINE. THE VEHICLE WAS DESTROYED. THE DEALER AND THE MANUFACTURER WERE NOT CONTACTED. THE FAILURE MILEAGE 68,000.

- 2008 Hyundai Elantra
  - o NHTSA ID No.: 11222531
  - o Filed: June 25, 2019
  - o Summary of Complaint:
    - ON JUNE 21, 2019 I WAS ON MY WAY TO TAKE MY SON TO WORK AND I HAD MY GRANDCHILDREN IN THE BACK SEAT. I PULLED OUT OF THE DRIVEWAY AT APPROX. 7:30A.M. AND DROVE ABOUT 100 FEET WHEN MY CAR STARTED SMOKING UNDER THE HOOD, I QUICKLY BACKED UP INTO OUR YARD. I GOT EVERYONE OUT OF THE CAR, MY SON LIFTED THE HOOD AND THERE WAS SMOKE AND FIRE. THE FIRE WAS COMING FROM BEHIND THE BATTERY. WE QUICKLY CALLED 911. MY CAR IS TOTALED. I ONLY HAD PIP INSURANCE AND I AM CURRENTLY WITHOUT A VEHICLE. I WAS NOT AWARE OF ANY RECALLS BECAUSE I PURCHASED THE VEHICLE FROM A PRIVATE OWNER IN 2009 OR 2010. PICTURES ARE ATTATCHED. I NOTICED THE DAY BEFORE THAT MY PASSANGER WINDOWS DID NOT WORK, AND THE MORNING OF THE FIRE WHEN I TURNED THE CAR ON MY BREAK LIGHT WAS ON THE DASH, BUT MY EMERGENCY BREAKS WERE NOT LIFTED. . I DROVE THE CAR THE DAY BEFORE AND DID'NT DRIVE IT AGAIN UNTIL THE MORNING OF THE FIRE.

- 2008 Hyundai Elantra
  - o NHTSA ID No.: 11176655
  - o Filed: February 12, 2019
  - o Summary of Complaint:
    - AFTER SITTING FOR 43 HOURS IN OUR DRIVEWAY THE 2008 HYUNDAI ELANTRA CAUGHT FIRE STARTING ON THE DRIVER'S SIDE OF THE ENGINE COMPARTMENT AND CONTINUED ACROSS AND THROUGH THE VEHICLE. ***IT SHOULD BE NOTED THE VEHICLE HAD A SMOKING ISSUE IN THE COMPARTMENT A MONTH PREVIOUS AND WAS TAKEN TO THE HYUNDAI SHOP AND A REPAIR ESTIMATE PROVIDED THAT INCLUDED THE MASTER CYLINDER AND THE ANTILOCK BRAKE SYSTEM.*** AT THAT TIME WHEN THE SMOKE

16

INCIDENT HAPPENED THE ANTILOCK SYSTEM ENGAGED AND THE BRAKE PEDAL WENT TO THE FLOOR. I OBSERVED WHERE THE SMOKE WAS COMING FROM AND POINTED AT THE ABS BLOCK TO THE SERVICE MANAGER. VEHICLE WENT BACK INTO USE AND I ORDERED PARTS. INSTALLED MASTER CYLINDER BUT ABS PARTS DID NOT ARRIVE BEFORE VEHICLE IMMOLATED ITSELF. IN THE 43 HOUR NON USE GAP, THE VEHICLE DID NOT HAVE THE REMOTE ENTRY FOB USED NOR ANY KEY ENTRY. FIRE DEPARTMENT PUT THE CAUSE AS BEING AN ELECTRICAL FIRE.

- 2009 Hyundai Elantra
  - o **NHTSA ID No.:** 11140848
  - o Filed: October 17, 2018
  - o Summary of Complaint:
    - ▪ ON 09/17/2018 *I WOKE UP AROUND 5 AM TO FIND THE ELANTRA FULLY ENGULFED IN FLAMES IN THE FRONT END. IT WASN'T RUNNING, NOTHING LEFT ON, IT HAD NOT BEEN RUN FOR 4 HOURS SO THE ENGINE SHOULD HAVE BEEN COLD.* NO DRIVABILITY PROBLEMS BEFORE. POLICE AND FIRE DEPARTMENT RESPONDED, PUT THE FIRE OUT AND STATED THAT THEY SAW NOTHING SUSPICIOUS ABOUT THE FIRE AND THAT I SHOULD CHECK ON PROBLEMS WITH HYUNDAI. THIS CAR ONLY HAD 70000 MILES ON IT WITH A 10 YEAR 100000 MILE WARRANTEE . *I WENT TO THE DEALER, THEY TOLD ME IT WAS NOT COVERED WITHOUT EVEN LOOKING AT IT. THIS CAR WAS COLD, PARKED, NOTHING ON, NO KEYS IN IT, I DON'T SEE ANY REASON IT SHOULD HAVE CAUGHT FIRE*. IT WAS A TOTAL LOSS. THANK YOU.

- 2007 Hyundai Elantra
  - o **NHTSA ID No.:** 11325178
  - o **Filed:** May 19, 2020
  - o Summary of Complaint:
    - ▪ TL* THE CONTACT CALLED ON BEHALF OF THE VEHICLE OWNER HIS STEPSON. THE CONTACT STATED *WHILE THE STEPSON'S VEHICLE A 2007 HYUNDAI ELANTRA WAS PARKED IN FRONT OF AN APARTMENT COMPLEX, THE VEHICLE CAUGHT ON FIRE*. THE CONTACT WAS ALERTED BY THE FIRE DEPARTMENT WHOM EXTINGUISHED THE FIRE AND FILED A REPORT. THE CONTACT STATED THAT THE ENGINE COMPARTMENT WAS BURNT. *THERE WAS NO WARNING INDICATORS ILLUMINATED PRIOR TO THE FAILURE. THE VEHICLE WAS TOTALED.* THE CONTACT STATED THAT HE WAS INFORMED OF NHTSA CAMPAIGN NUMBER: 20V061000 (SERVICE BRAKES, HYDRAULIC) BY THE

INSURANCE COMPANY HOWEVER, THE VIN WAS NOT INCLUDED IN THE RECALL. THE CONTACT CALLED AN UNKNOWN HYUNDAI DEALER IN ORLANDO, FL AND WAS REFERRED TO THE MANUFACTURER. THE CONTACT CALLED THE MANUFACTURER SEVERAL TIMES AND WAS UNABLE TO REACH A LIVE AGENT. THE FAILURE MILEAGE WAS UNKNOWN.

- 2007 Hyundai Elantra
  - o NHTSA ID No.: 11310173;
  - o Filed:  February 19, 2020
  - o Summary of Complaint:
    - ▪ SOME TIME BETWEEN APPROXIMATELY BETWEEN 12:00 AM AND 4:00 AM ON 2/1/2020, ***THE VEHICLE CAUGHT FIRE ON IT'S OWN (IT WAS PARKED AND OFF) AND BADLY BURNED OUR GARAGE/HOME CAUSING EXTENSIVE PROPERTY DAMAGE TO THE GARAGE AND INTERIOR OF OUR HOME***.

- 2007 Hyundai Elantra
  - o NHTSA ID No.: 11051523
  - o Filed: November 30, 2017
  - o Summary of Complaint:
    - ▪ MY CAR SPONTANEOUSLY CATCH FIRE ON ITS OWN. THE CAR PARKED ON MY FRONT YARD FOR AT LEAST 3 HOURS. IT WENT AFLAME, THE WHOLE ENGINE WAS DESTROYED. EVERY THING CAUGHT ON HOME SECURITY CAMERA.

- 2008 Hyundai Elantra
  - o NHTSA ID No.: 10875551
  - o Filed: June 21, 2016
  - o Summary of Complaint:
    - ▪ TL* THE CONTACT OWNED A 2008 HYUDAI ELANTRA. WHILE PARKING THE VEHICLE AFTER DRIVING FOR APPROXIMATELY FIVE MINUTES, IT CAUGHT ON FIRE. THE FIRE DEPARTMENT EXTINGUISHED THE FIRE AND FILED A REPORT. THE VEHICLE WAS TOWED BY THE INSURANCE COMPANY. THE FIRE DEPARTMENT DIAGNOSED THE VEHICLE WITH FAILED WIRES. THE VEHICLE WAS DESTROYED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 40,000.

- 2008 Hyundai Elantra
  - o NHTSA ID No.: 10993003
  - o Filed: June 3, 2017

- o Summary of Complaint:
  - ▪ DROVE CAR TO GROCERY STORE 6 MILE ROUND TRIP PARKED CAR IN GARAGE AT 10:15 AM. I PERFORMED YARD WORK IN FRONT OF AND WAS IN AND OUT OF GARAGE FOR 4 HOURS. AT NO TIME WAS THERE A HINT OF SMOKE OR BURNING. THEN CUT GRASS FOR 2 HOURS. *AT ABOUT 4 PM SMOKE WAS BILLOWING OUT OF THE GARAGE. I OBSERVED FLAMES AND SMOKE COMING FROM AROUND THE FRONT HOOD*. UNABLE TO LIFT HOOD TO REACH FIRE SOURCE WITH EXTINGUISHERS OR GET CAR INTO NEUTRAL TO PUSH OUT OF GARAGE. I WAS DRIVEN BY SMOKE AND FLAME OUT OF GARAGE. *BOTH THE 2008 HYUNDAI AND ANOTHER VEHICLE IN THE TWO CAR GARAGE BURNED COMPLETELY*. ALL CONTENTS IN GARAGE DESTROYED EXTENSIVE SMOKE DAMAGE THROUGHOUT HOUSE. *FIRE FORENSIC INVESTIGATOR THINKS IT WAS CAUSED BY THE BATTERY* BUT THERE WAS TOO MUCH DAMAGE TO MAKE MUCH OF AN INFORMED COMMENT AS TO PRECISE REASON CAR CAUGHT FIRE. REASON FOR FIRE IS UNKNOWN. ADVANCED AUTO BATTERY PURCHASED OCTOBER 17, 2014. PART # 121R1. #420 D2LNM1C1Q21B5J. REPAIR OF REAR MAIN SEAL IN JULY 2016 BY COCHRAN MONROEVILLE HYUNDAI SERVICE DEPARTMENT. FOG LIGHTS MINI LAMPS A TOTAL OF TWENTY, 20, LIGHTS (FOG, BREAK, HEADLIGHTS, LICENSE PLATE) FRONT RIGHT AND LEFT, REAR RIGHT AND LEFT WERE REPLACED. REAR LEFT LAMP AND BULB HOUSING REPLACED JUNE 28, 2016 AT A COST OF $236 BY DEALER.
- 2007 Hyundai Elantra
  - o **NHTSA ID No.:** 11051523
  - o **Filed: November 30, 2017**
  - o Summary of Complaint:
    - ▪ *MY CAR SPONTANEOUSLY CATCH FIRE ON ITS OWN. THE CAR PARKED ON MY FRONT YARD FOR AT LEAST 3 HOURS. IT WENT AFLAME*, THE WHOLE ENGINE WAS DESTROYED. EVERY THING CAUGHT ON HOME SECURITY CAMERA.
- 2007 Hyundai Elantra
  - o NHTSA ID No.: 10956981
  - o Filed: February 25, 2017
  - o Summary of Complaint:
    - ▪ COLD CAR CATCHES ON FIRE TOTAL LOST. WAS PARKED ON MY DRIVEWAY
- 2008 Hyundai Elantra
  - o NHTSA ID No.: 11321087

- o Filed: April 14, 2020
- o Summary of Complaint:
  - ▪ MY 2008 HYUNDAI CAUGHT FIRE IN MY GARAGE ON FEBRUARY 18, 2020. THE FIRE DESTROYED MY CAR AND MY GARAGE. MY NEIGHBOR HAPPENED TO BE TAKING HIS DOG OUT AT 4:00 AM AND SMELLED SMOKE. HE LOOKED OVER AND SAW SMOKE COMING OUT OF MY GARAGE.HE FRANTICALLY RANG THE DOORBELL, WOKE ME AND MY HUSBAND UP AND WE CALLED 911. ***WE COULD HAVE DIED AS A RESULT***. *TR

- • 2009 Kia Sportage
  - o NHTSA ID No.: 11192437
  - o Filed: March 29, 2019
  - o Summary of Complaint:
    - ▪ ***A FIRE STARTED IN THE ENGINE COMPARTMENT ON THE PASSENGER SIDE APPROXIMATELY 45 MINUTES AFTER PARKING*** THE VEHICLE AT MY PLACE OF EMPLOYMENT. WHILE SEARCHING THE INTERNET I FOUND THERE WAS A RECALL FOR THIS EXACT THING. I WAS NEVER NOTIFIED ABOUT THE RECALL AND NOW MY VEHICLE IS TOTALED FROM THE LACK OF NOTICE.

- • 2009 Kia Sportage
  - o NHTSA ID No.: 11129191
  - o Filed: September 12, 2018
  - o Summary of Complaint:
    - ▪ ON TUESDAY AUGUST 28TH 2018 MY CAR WAS PARKED IN AN APARTMENT PARKING LOT, AND HAD BEEN OFF FOR 4 HOURS. ***I WOKE UP TO MY CAR ALARM GOING OFF AT 12AM***. I LOOKED OUT THE WINDOW AND THE LIGHTS WERE NOT FLASHING ON MY CAR SO I DIDN'T THINK IT MINE. ***NOT MORE THAN 1 MINUTE LATER MY CAR STARTED ON FIRE. THANK GOODNESS MY BOYFRIEND WAS A FIREFIGHTER.*** HE CALLED 911 AND THE FIRE WAS PUT OUT WITH 15 MINUTES. ***HOWEVER MY CAR WAS DETERMINE A TOTAL LOSS. ALL THEY COULD TELL ME WAS THAT IT LOOKED LIKE IT WAS AN ELECTRICAL FIRE***. NO ONE WAS HURT, BUT ***HAD I BEEN AT HOME THAT NIGHT IN MY DUPLEX WHO I SHARE WITH MY NEIGHBORS AND THEIR INFANT, AND PARKED IN MY GARAGE MY HOUSE WOULD HAVE BEEN BURNED AND I WOULD BE DEAD***. IT WAS A 2009 KIA SPORTAGE AND I HAD NEVER HAD A SINGLE ISSUE WITH THE CAR IN THE 9 YEARS THAT I OWED IT. I WAS THE ONLY OWNER SO I KNEW MY CAR WAS WELL TAKEN CARE OF.

WITH KIA IN THE NEWS A LOT LATELY WITH CAR FIRES I CAN'T HELP BUT FEEL THERE SHOULD BE AN INVESTIGATION.

- 2009 Kia Sportage
  - o NHTSA ID No.: 10532051
  - o Filed: July 26, 2013
  - o Summary of Complaint:
    - TL* THE CONTACT OWNS A 2009 KIA SPORTAGE. THE CONTACT STATED THAT *WHILE PARKED, THE VEHICLE CAUGHT ON FIRE WITHOUT WARNING*. A POLICE REPORT WAS FILED AND THE VEHICLE WAS TOWED TO A INDEPENDENT MECHANIC. THE CONTACT MENTIONED THE VEHICLE WAS INSPECTED BY AN INSURANCE ADJUSTER, WHO CONCLUDED THAT THE FIRE ORIGINATED IN THE REAR DASHBOARD AREA. THE VEHICLE WAS NOT TAKEN TO A DEALER FOR A DIAGNOSTIC TEST. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE VEHICLE WAS DESTROYED. THE APPROXIMATE FAILURE AND CURRENT MILEAGE WAS 64,000.
- 2008 Hyundai Entourage
  - o NHTSA ID No.: 11110123
  - o Filed: July 8, 2018
  - o Summary of Complaint:
    - *VEHICLE WAS PARKED IN THE DRIVEWAY, NOT DRIVEN FOR APPROXIMATELY ONE WEEK.* THE ENGINE COMPARTMENT STARTED SMOKING THEN ERUPTED IN FLAMES
- 2008 Kia Sorento
  - o NHTSA ID No.: 11128582
  - o Filed: September 10, 2018
  - o Summary of Complaint:
    - SUNDAY SEPT 9TH AT AROUND 9 - 9:30 *AM I SMELLED SMOKE AND WALKED AROUND THE HOUSE AND SMELLED THAT IT WAS COMING FROM THE GARAGE*. WHEN I OPENED THE DOOR *I SAW FLAMES UNDERNEATH THE CAR AND SMOKE AND FIRE ON TOP OF THE HOOD*. I CALLED THE PALM BAY FIRE DEPARTMENT WHEN THEY GOT THERE THEY PUT THE HOSE ON THE CAR UNTIL THE FIRE WAS OUT THEY HAD TO CUT THE HOOD IN ORDER TO FINISH PUTTING OUT THE FIRE. *THEY FIRE MARSHALL CAME AND INSPECTED THE VEHICLE IT COULD HAVE BEEN AN ELECTRICAL PROBLEM.* WHEN I CALLED KIA CUSTOMER SERVICE THEY GAVE ME A CLAIM NUMBER AND THEY TOLD ME WHAT WOULD YOU LIKE KIA DO FOR YOU . THE CUSTOMER SERVICE AGENT SAID THEY

21

WILL GIVE THE CLAIM TO THE RIGHT DEPARTMENT AND THEY WILL GET BACK TO ME IN 3 TO 5 BUSINESS DAYS. ***THIS HAPPENED WHILE THE CAR WAS PARKED IN THE GARAGE AND IT HADN'T BEEN TURNED ON SINCE FRIDAY*** . THIS VEHICLE WAS A 2008 SORENTO WITH LESS THAN 90,000 MILES IT WAS IN GREAT CONDITION ALS

- 2008 Kia Sorento
  - o  NHTSA ID No.:  11089996
  - o  Filed: April 25, 2018
  - o  Summary of Complaint:
    - ▪ I DROVE MY 08 KIA SORENTO HOME AT ABOUT 730 AM. I WORK NIGHT SHIFT AND WENT TO SLEEP AND ***WAS WOKEN UP AT 945 BY EMS TO MY CAR UP IN FLAMES. IT WAS SHOWING NO SIGNS OF ANY PROBLEMS,*** NOT RUNNING HOT, NOTHING. IT WAS PARKED FOR ABOUT AN HOUR WHEN IT WENT UP IN FLAMES. THE FIRE CHIEF WAS ON THE TRUCK THAT DAY AS HE HAD ORIENTEE'S, AND SAID THE FIRE STARTED BEHIND THE STEERING WHEEL/DASH AND THAT IT WAS AN ELECTRICAL ENGINE FIRE WHICH IS STATED ON MY FIRE REPORT. ***I CONTACTED KIA THEY TOLD ME IT WAS NO WAY IT WAS THEIR PROBLEM AND HAD TO BE A USER ERROR.***

- 2006 Kia Sedona
  - o  NHTSA ID No.:  11321732
  - o  Filed: April 20, 2020
  - o  Summary of Complaint:
    - ▪ TL* THE CONTACT OWNS A 2006 KIA SEDONA. THE CONTACT STATED THAT WHEN HER HUSBAND WAS PARKING THE VEHICLE IN HER DRIVEWAY, ***SHE NOTICED THAT SMOKE BEGAN EMITTING FROM UNDERNEATH THE VEHICLE; MOMENTS LATER, THE VEHICLE CAUGHT FIRE.*** THE CONTACT WAS UNAWARE IF THERE WERE ANY ILLUMINATED WARNING LIGHTS PRIOR TO THE FAILURE. THE CONTACT WAS ABLE TO GRAB A WATER HOSE AND EXTINGUISH THE FIRE INDEPENDENTLY. THE CONTACT'S HUSBAND, WITH THE HELP OF SOME NEIGHBORS, WAS ABLE TO MANUALLY PUSH THE VEHICLE OUT OF THE DRIVEWAY AND PARK IT ON THE SIDE OF THE STREET. THE CONTACT STATED ***PRIOR TO THE FIRE, SHE HAD RECEIVED A RECALL NOTIFICATION FOR NHTSA CAMPAIGN NUMBER: 20V088000 (ELECTRICAL SYSTEM, SERVICE BRAKES, HYDRAULIC) HOWEVER, THE PARTS TO DO THE REPAIR WERE UNAVAILABLE. THE CONTACT STATED THAT THE MANUFACTURER EXCEEDED A REASONABLE AMOUNT OF***

***TIME FOR THE RECALL REPAIR***. THE MANUFACTURER NOR THE DEALER WERE NOTIFIED OF THE FAILURE OR THE RECALL. THE FAILURE MILEAGE WAS UNKNOWN. ***VIN TOOL CONFIRMS PARTS NOT AVAILABLE.***

- 2006 Kia Sedona
  - o   NHTSA ID No.:  11256149
  - o   Filed: September 17, 2019
  - o   Summary of Complaint:
    - ▪ TL* THE CONTACT OWNS A 2006 KIA SEDONA. ***WHILE DRIVING 10 MPH, THE CONTACT NOTICED SMOKE COMING FROM THE ENGINE WITHOUT WARNING***. THE CONTACT PULLED THE VEHICLE OVER AND WAITED A FEW MINUTES TO ALLOW THE ENGINE TO COOL OFF. THE CONTACT ATTEMPTED TO RESTART THE VEHICLE, BUT IT WOULD NOT START. THE CONTACT BEGAN TO NOTICE MORE SMOKE COMING FROM THE VEHICLE AND SMELLED A BURNING PLASTIC ODOR. THE CONTACT REMOVED HERSELF AND HER KIDS FROM THE VEHICLE. THE CHILD'S SCHOOL MAINTENANCE MAN ASSISTED THE CONTACT AND ASKED HER TO OPEN THE VEHICLE'S HOOD. ***AS THE HOOD WAS OPENED, FLAMES BEGAN TO EMIT FROM THE VEHICLE.*** THE MAINTENANCE PERSON CALLED THE FIRE DEPARTMENT FOR ASSISTANCE. THE FIRE WAS EXTINGUISHED AND A FIRE REPORT WAS FILED. THERE WERE NO INJURIES. THE CONTACT'S INSURANCE COMPANY HAD THE VEHICLE TOWED TO THE CONTACT'S HOME. THE VEHICLE WAS NOT DESTROYED. A VIN SEARCH CONFIRMED THAT THERE WERE NO ACTIVE RECALLS ON THE VEHICLE. THE MANUFACTURER AND DEALER WERE NOT NOTIFIED. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE FAILURE MILEAGE WAS APPROXIMATELY 175,000.

- 2006 Kia Sedona
  - o   NHTSA ID No.:  11320439
  - o   Filed: April 7, 2020
  - o   Summary of Complaint:
    - ▪ TL* THE CONTACT OWNS A 2006 KIA SEDONA. THE CONTACT STATED THAT ***WHILE HIS WIFE WAS DRIVING THE VEHICLE, THE VEHICLE'S ABS WARNING LIGHT SUDDENLY BEGAN TO ILLUMINATE AND THE WARNING SOUNDER BEGAN TO CHIME. AS HIS WIFE BEGAN TO PULL INTO THEIR GARAGE, THE CONTACT NOTICED SMOKE COMING FROM THE UNDER THE HOOD OF THE VEHICLE.*** HIS WIFE TURNED OFF THE VEHICLE AND THE CONTACT BEGAN TO PUT OUT THE FIRE. HOWEVER, IT WAS A LITTLE DIFFICULT FOR THE CONTACT

TO EXTINGUISH THE FIRE, SO THE CONTACT DETACHED THE BATTERY, WHICH, MADE IT EASIER FOR THEM TO EXTINGUISH THE FIRE. THERE WERE NO INJURIES. THE FIRE DEPARTMENT WAS NOT CONTACTED AND FIRE REPORT WAS NOT MADE. THE CONTACT DID NOT CONTACT THE DEALER. THE VEHICLE HAD NOT BEEN OFFICIALLY DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE ISSUE AND OPENED A CASE REGARDING THE MATTER. THE MANUFACTURER INFORMED THE CONTACT THAT A FUTURE RECALL NOTICE HAD NOT BEEN RELEASED DUE TO PARTS FOR A REMEDY NOT YET BEING AVAILABLE. THE APPROXIMATE FAILURE MILEAGE WAS 228,000.

- 2007 Kia Sedona
  - o   NHTSA ID No.:  11308166
  - o   Filed: February 10, 2020
  - o   Summary of Complaint:
    - ▪   ***MY CAR WAS PARKED IN MY DRIVEWAY, NOT RUNNING, NO KEY IN THE IGNITION, AND HAD NOT BEEN DRIVEN SINCE THE PREVIOUS DAY. ONE OF THE KIDS WENT OUTSIDE TO PLAY AND CAME RUNNING BACK IN TO TELL US THE CAR WAS SMOKING***. THERE WAS SMOKING COMING OUT FROM UNDER THE HOOD. MY BOYFRIEND QUICKLY GOT TO IT AND GOT THE BATTERY OUT AND FOUND THE SOURCE AND UNPLUGGED THE ELECTRICAL STABILITY CONTROL MODULE ( I BELIEVE IS WHAT HE CALLED IT) EITHER WAY, THE PLUG AND WIRES WERE FRIED. THE DEALERSHIP STATED THAT HAD WE NOT SEEN THIS IT WOULD HAVE CAUGHT FIRE. ***I CALLED THE KIA CORPORATE NUMBER AND THEY TOLD ME SORRY BUT ITS AN OUT OF POCKET EXPENSE, MY CAR IS NOT UNDER WARRANTY AND THERE ARE NO RECALLS***. THIS IS NOT THE FIRST 07 KIA SEDONA TO HAVE THIS ISSUE BASED ON THE RESEARCH I HAVE DONE. AND HAD WE BEEN SLEEPING WHEN THIS HAPPENED MY HOUSE COULD HAVE CAUGHT FIRE. HAD THERE BEEN CHILDREN IN THIS AT THE TIME THEY COULD HAVE BEEN INJURED.

- 2007 Kia Sedona
  - o   NHTSA ID No.:  11098160
  - o   Filed: May 27, 2018
  - o   Summary of Complaint:
    - ▪   OUR 2007 LOW MILEAGE KIA HAD BEEN PARKED FOR OVER 24 HRS. WHILE SITTING IN OUR DRIVEWAY NOT RUNNING, NO KEYS IN IGNITION, CAUGHT FIRE AND BURNED TO THE GROUND. THE FIRE TRAVELLED TO MY STORAGE BUILDING.

*WE LOST EVERYTHING IN OUR STORAGE AND OUR VEHICLE. KIA ASSUMES NO FAULT*. ATTACHED IS FIRE DEPARTMENT REPORT AND PICS OF THE DAMAGE.

- 2007 Kia Sedona
  - o NHTSA ID No.:  11090369
  - o Filed: April 26, 2018
  - o Summary of Complaint:
    - ▪ WHILE MY KIA SEDONA WAS PARKED IN THE DRIVEWAY. HAD BEEN PARKED ABOUT AN HOUR WHEN SMOKE SUDDENLY STARTED COMING FROM UNDER THE HOOD. SOON, THE ENTIRE FRONT END WAS ON FIRE AND LOCAL FIRE DEPARTMENT CAME AND PUT THE FIRE OUT. VEHICLE WAS A TOTAL LOSS *KIA COORPERATE SAYS IT'S NOT THEIR PROBLEM.*

- 2008 Kia Sedona
  - o NHTSA ID No.:  10875413
  - o Filed: June 20, 2016
  - o Summary of Complaint:
    - ▪ ON 05-10-16 MY *2008 KIA SEDONA WAS PARKED IN THE DRIVE WAY. IT WAS NOT ON. IT HAD NOT BEEN DRIVEN FOR MORE THAN 24 HOURS.* THE KEY WAS NOT IN THE IGNITION. WE WERE REMOVING ONE OF THE BACK PASSENGER SEATS ON THE DRIVER'S SIDE. THE SIDE DOOR HAD REMAINED OPEN. IN THE PAST WE HAD PROBLEMS WITH THE DRIVER'S SIDE SLIDING DOOR, IT WOULDN'T OPEN OR WOULDN'T CLOSE. WHILE REMOVING THE SEAT THE OPEN DOOR INDICATOR (BUZZING) CAME ON. DID NOT KNOW WHY IT CAME ON, THE CAR WAS IN PARK AND WAS OFF. *A COUPLE OF MINUTES LATER THE SMELL OF SMOKE WAS COMING FROM THE CAR. DID NOT SEE WHERE IT WAS COMING FROM AT FIRST AND THEN SMOKE WAS COMING OUT OF THE ENGINE AREA. THE HOOD WAS OPENED AND THERE WERE FLAMES ON THE DRIVER'S SIDE BEHIND THE STEERING WHEEL*. THE FIRE DEPT. WAS CALLED BUT WE WERE ABLE TO PUT THE FLAMES OUT BEFORE IT BECAME DANGEROUS AND CANCELLED THE CALL. THE BATTERY HAD TO BE DISCONNECTED TO AVOID HAVING THE FLAMES START UP AGAIN. THE VEHICLE WAS TOWED TO A KIA DEALER TO INVESTIGATE THE CAUSE. *AFTER A FEW DAYS OF WAITING THE DEALER CONCLUDED THE ABS MAY HAVE CAUSED THE FIRE.* THE FIRE HAD BURNED THE WIRING HARNESS AND FIRE WALL. THE CAR WAS TOTALED DUE TO NOT BEING ABLE TO CONFIRM THE ACTUAL CAUSE OF THE FIRE. TO

DATE WE DO NOT KNOW WHAT ACTUALLY CAUSED THE FIRE BUT WE HAD TO BUY ANOTHER CAR.

I WANT TO POINT OUT IF YOU HAVE A PROBLEM WITH THE DOOR SYSTEM BE ALERT. IF YOUR CAR IS IN PARK WITH THE KEY OUT OF THE IGNITION AND YOU HAVE WARNING BUZZARDS GO OFF CHECK THE CURRENT STATUS OF THE VEHICLE, POSSIBLE RELAY OVER LOAD TO DOOR CONNECTION. NOT CONFIRMED, BUT WAS THE ONLY POWER OPERATING PART TO THE VEHICLE THAT WAS IN USE WHEN THE FIRE STARTED.

- 2009 Kia Sedona
  - o NHTSA ID No.:  11311935
  - o Filed: February 27, 2020
  - o Summary of Complaint:
    - ▪ THE VEHICLE WAS STATIONARY AND A FIRE STARTED SOMEWHERE IN THE ENGINE AND THE WHOLE CAR BURNED.
- 2010 Kia Sedona
  - o NHTSA ID No.:  10972249
  - o Filed: •April 13, 2017
  - o Summary of Complaint:
    - ▪ TL* THE CONTACT OWNED A 2010 KIA SEDONA. WHILE DRIVING 65 MPH, THE VEHICLE SUDDENLY ACCELERATED WITHOUT WARNING WHILE THE CRUISE CONTROL WAS ENGAGED. THE BRAKE PEDAL WAS DEPRESSED, BUT FAILED TO STOP THE VEHICLE. IN ADDITION, THE EMERGENCY BRAKES FAILED. THE CONTACT WAS ABLE TO STOP THE VEHICLE BY TURNING THE IGNITION OFF AND REMOVING THE KEY. UPON EXITING THE VEHICLE, A BYSTANDER WAS RUNNING TOWARDS THE VEHICLE WITH A FIRE EXTINGUISHER. THE CONTACT NOTICED FLAMES UNDER THE FRONT END OF THE VEHICLE. THE FIRE WAS FINALLY EXTINGUISHED BY THE FIRE DEPARTMENT. THERE WERE NO INJURIES. A FIRE AND A POLICE REPORT WERE FILED. THE VEHICLE WAS TOWED AND DEEMED A TOTAL LOSS. THE CAUSE OF THE FAILURE WAS NOT DETERMINED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 106,000.
- 2008 Kia Sportage
  - o NHTSA ID No.:  11315840
  - o Filed: March 3, 2020
  - o Summary of Complaint:

- MY KIA SPORTAGE WAS PARKED IN FRONT OF A GARAGE WAS NOT TURNED ON AND WAS IN PARK WHEN THE ENGINE SUDDENLY CAUGHT FIRE IT SOUNDED LIKE A LOUD BOMB. THE FRONT OF THE VEHICLE WAS DESTROYED THE VEHICLE WAS NOT SALVAGEABLE.

- 2008 Kia Sportage
  - NHTSA ID No.:  11204208
  - Filed: April 28, 2019
  - Summary of Complaint:
    - CAR WAS SITTING IN DRIVE WAY FOR A DAY AND HALF AT 335 IN THE MORNING ELECTRICAL SHORT STARTED A FIRE WAS CAUGHT ON NEIGHBOR SECURITY CAMERA

- 2006 Hyundai Sonata
  - NHTSA ID No.:  11114927
  - Filed: July 31, 2018
  - Summary of Complaint:
    - TL* THE CONTACT OWNED A 2006 HYUNDAI SONATA. ***WHILE DRIVING HIGHWAY SPEEDS, THE VEHICLE MADE AN ABNORMAL NOISE AND SMOKE EMITTED FROM THE ENGINE COMPARTMENT. THE FAILURE OCCURRED WITHOUT WARNING***. THE CONTACT WAS ABLE TO SAFELY MANEUVER FROM THE HIGHWAY TO A PARKING LOT. THE CONTACT EXITED THE VEHICLE AND OBSERVED FLAMES UNDERNEATH THE VEHICLE. THE FIRE DEPARTMENT WAS CONTACTED AND EXTINGUISHED THE FIRE. THE VEHICLE WAS TOWED TO A SALVAGE YARD WHERE IT WAS DEEMED A TOTAL LOSS. THE DEALER AND MANUFACTURER WERE NOT NOTIFIED. THERE WERE NO INJURIES. THE CONTACT STATED THAT THE VEHICLE WAS INCLUDED IN NHTSA CAMPAIGN NUMBER: 18V026000 (SERVICE BRAKES, HYDRAULIC). THE FAILURE MILEAGE WAS APPROXIMATELY 100,000.

- 2008 Hyundai Azera
  - NHTSA ID No.:  11072177
  - Filed: February 11, 2018
  - Summary of Complaint:
    - FIRE IN ENGINE COMPARTMENT WHILE CAR WAS PARKED & OFF. KEY WAS NOT IN IGNITION. CAR SAT UNUSED FOR APPROX. 48 HOURS PRIOR TO FIRE.

- 2008 Hyundai Azera
  - NHTSA ID No.:  11202884

- o   Filed: April 22, 2019
- o   Summary of Complaint:

> JANUARY 24, 2018 — HYUNDAI IS RECALLING ABOUT 88,000 MODEL YEAR 2006-2011 HYUNDAI AZERA AND 2006 HYUNDAI SONATA CARS BECAUSE THE ENGINE COMPARTMENTS MAY CATCH ON FIRE. ON 1/10/18, 2 WEEKS PRIOR TO THIS RECALL MY 2008 HYUNDAI AZERA CAUGHT FIRE IN MY BASEMENT WHILE IT WAS PARKED AND NO KEY WAS IN THE IGNITION. THIS HAPPENED AT 3:30AM, ***OUR ENTIRE HOUSE, INCLUDING BOTH OF OUR VEHICLES WERE DESTROYED. NOTHING WAS SALVAGEABLE***.

**D.    The Defect caused Plaintiff's 2007 Hyundai Entourage to catch fire while parked in his garage, threatening his family's life, and causing damage to his home.**

54.    Plaintiff purchased his 2007 Hyundai Entourage on June 10, 2008, from a Hyundai dealership in Newport, Rhode Island. Plaintiff's vehicle was a "certified pre-owned" vehicle.  On the "sticker" display, Hyundai claimed that the vehicle had "a bevy of standard safety equipment" and promoted that it was "[n]amed an Insurance Institute for Highway Safety 2007 Top safety Pick." Hyundai further claimed that the vehicle had undergone a "150-point pre-delivery Hyundai certified inspection."

55.    The safety and reliability of the 2007 Hyundai Entourage were important factors to Plaintiff in purchasing the vehicle and choosing to purchase the extended "Platinum" warranty which covers practically all mechanical failures within the vehicle.

56.    Throughout his ownership of the vehicle, Plaintiff performed all the recommended manufacturer maintenance and otherwise properly cared for his vehicle.

57.    In the evening on March 26, 2019, Plaintiff was sitting in his living room when he heard the sound of his 2007 Hyundai Entourage alarm. Plaintiff immediately ran to his attached garage where he saw a thick black plume of black smoke emanating from his parked vehicle.  The fire emanating from the engine compartment of his vehicle had grown so large that parts of his garage and home had turned black with soot.

58.    While his vehicle was on fire, Plaintiff was forced to enter the vehicle to shift it to neutral and push the vehicle out of his garage. Below are the distressing pictures taken by Plaintiff in front of his home after he had removed the vehicle from his garage and his local fire department arrived at his

home:





59.    At the time of the fire, Plaintiff was home with his entire family. Thus, the Defect not only resulted in loss of Plaintiff's vehicle and damage to his personal property, as well as his neighbor's property, it placed his family's lives in grave danger.

60.    Like numerous incidents reported to NHTSA by Class Vehicle owners, Plaintiff's vehicle had been turned off for approximately five hours prior to the fire.

61.    Plaintiff retained an experienced Fire and Explosion Investigator to determine the cause

CLASS ACTION COMPLAINT

of the engine compartment fire in his vehicle.  The investigation revealed that the fire originated in the vehicle's rear of the engine compartment behind the battery and above the transmission on the driver's side.

62.     Specifically, the investigator found it was "more likely than not" that (1) the fire originated in the ABS module; (2) the first fuel ignited was the plastic components of the ABS module; and (3) the source of ignition was a short circuit within the ABS module, which was connected to the vehicle's 12 VDC battery system.

63.     Below are pictures taken as part of the investigation, which support its findings:

    a.   Driver's side of the Hyundai Entourage:



    b.   Front view of vehicle: Ventilation and plastic parts lead to greater damage in this area, but patterns are consisting with a fire starting behind the radiator:

CLASS ACTION COMPLAINT



c. Hood, looking from the front: Paint is completely burned away over left rear section of the engine compartment (red outline). Damage at front of hood due to more available oxygen (yellow outline):

d. Engine compartment, looking from the front: Damage is more severe on the driver's side.



e. Inconsistent fire damage at the ABS module.



f. Detail of previous photo, showing loss of material in the ABS module.

CLASS ACTION COMPLAINT



64. The investigator noted that the seals to ABS modules fail over time, which can leak water to enter the ABS module. This, in turn, can lead to an electrical short and fire.

65. Following the near loss of his home and life-threatening danger his family was placed in, Plaintiff incurred thousands of dollars in damages and expenses that he would not have incurred but for the Defect. In addition to the damage of his vehicle, Plaintiff was forced to replace personal items lost in the fire, including his toddler's car seat and stroller, pay for damage to a neighbor's property, pay for an interim car rental, purchase a safe replacement vehicle, and pay for damage to his vehicle parked adjacent to his 2007 Hyundai Entourage at the time of the fire. Plaintiff also incurred expenses necessary to store his vehicle until such time that it can be adequately repaired.

66. As a result of the Defect nearly destroying Plaintiff's home and threatening the life of his family, Plaintiff and his wife suffered emotion distress and are permanently traumatized by the incident. Indeed, each time Plaintiff and his wife park their vehicles in or near their home they now have meaningful concerns for their family's safety.

**E.    Defendants had knowledge of the Defect for years prior to issuing any recalls.**

67. On information and belief, Defendants were aware of the Defect and the catastrophic risk it posed to Class Vehicle owners (as well as bystanders), through but not limited to: (1) Defendants' pre-sale durability testing and part sales, (2) Defendants' own records of customer complaints; (3)

dealership repair records; (4) NHTSA complaints; (5) warranty and post-warranty claims, and (6) Hyundai's U.S. Technical Committee responsible for safety recalls.

68. Defendants are experienced in the design and manufacture of consumer vehicles. As experienced manufacturers, Defendants conduct tests, including pre-sale durability testing, on incoming components, including ABS modules and HECUs, to verify the parts are free from defects and align with Defendants' specifications.

69. Kia conducts expansive presale durability testing on its vehicles to make sure they "endure over a long time without fault."[17]  Kia touts that as part of its durability testing it "ruin[s] [its] cars in various ways, identify causes and find solutions to them to make [its] cars endure over a long time without fault."[18] As part of this process, Kia conducts seven durability tests, including an item durability test of the vehicle's individual components, a module durability test, and a corrosion test. Relatedly, Kia conducts these tests "in extreme weather conditions including desert with blazing sunlight and coldness of 40 degrees below zero" to ensure that its vehicles can withstand all conditions.

70. Hyundai similarly conducts extensive safety and durability testing on its vehicles. Prior to putting a vehicle into the stream of commerce, Hyundai purports that its "cars undergo thousands of hours of examination and it's not just engine performance that is under scrutiny."[19] Like Kia, Hyundai touts that it "uses extreme weather conditions to test its cars and ensure they are ready for the road," including in Europe and the Mojave Desert.

71. Defendants also regularly monitor the NHSTA databases as part of its ongoing obligation to identify potential defects in its vehicles. Hyundai has stated publicly that it "ha[s] a robust system in place for monitoring and investigating reported vehicle fires that includes investigation and reporting to NHTSA as required."[20] Accordingly, the numerous complaints filed by Class Vehicle owners with

---

[17] http://www.kia.com/worldwide/experience_kia/rnd/performance.do (last accessed July 16, 2020).

[18] https://www.kia.com/dm/experience/innovation-story/performance.Lamba-Tau.html (last accessed July 16, 2020).

[19] https://www.hyundai.news/eu/model-news/hail-rain-or-shine-hyundai-motors-extreme-weather-testing/ (last accessed July 16, 2020).

[20] https://www.autoblog.com/2018/10/12/hyundai-kia-fires-center-for-auto-safety/ (last accessed July 16, 2020).

NHTSA establish that Defendants knew, or should have known, of the Defect at least as early as 2011, based on publicly available information, nearly a decade before Defendants issued the 2020 Recall.

72. Plaintiff's investigation revealed that the Defect was complained of on April 27, 2011, when an owner of a 2010 Hyundai Elantra reported that on October 16, 2020, their "6-month old Hyundai Elantra Touring caught fire after sitting in [his or her] driveway for nine hours."[21] The complaint further stated that his insurance company retained a forensic engineer to determine the origin of the fire. ***The engineer determined that "the fire was electrical and originated in the engine compartment."*** The owner's complaint warned that "as far as I know, Hyundai has not issued a recall or TSB on the car." The owner was correct, and Defendants' failure to recall the vehicles would result in a shocking number of additional fires and needlessly risk the lives of thousands.

73. Again, on October 23, 2013, an owner of a 2007 Hyundai Elantra in Coral Springs, Florida warned that their "[v]ehicle caught fire after sitting off for 5 hours."[22] The owner reported that the "***[f]ire department determined that fire originated in engine compartment"*** and that there was "***[p]robable cause of fire electrical within engine compartment***." Further, the owner maintained the vehicle in "excellent condition, never had any problems[,] was never in an accident[,] [and] [n]o recalls [were] issued for electrical issues in engine compartment."

74. One of the most egregious complaints ignored by Defendants was filed on June 20, 2016, when an owner of a 2008 Kia Sedona recounted the story of his vehicle erupting in flames while sitting in his driveway.[23] The vehicle was towed to a Kia dealership to investigate the cause of the fire. Within days of receiving the vehicle "***the dealer concluded the ABS may have caused the fire."*** This was based on the fact that "the fire had burned the wiring harness and fire wall." ***Thus, the Kia dealership specifically identified the Defect four years prior to Defendants' 2020 Recall***.

75. Similarly in 2016, following the spontaneous fire of a 2008 Hyundai Elantra an owner "contacted Hyundai directly and brought to their attention" that the local fire department "suspected [the fire] to be a manufacturers defect of possible faulty electrical wiring."[24] The owner "urge[d] and

---

[21] NHTSA ID No. 10398944; *see also* NHTSA ID No. 10400774.
[22] NHTSA ID No.: 10548829.
[23] NHTSA ID No.: 10875413.
[24] NHTSA ID No.: 10897621.

plead[ed] [Hyundai] to look into this matter[,]" particularly because he or she was "aware of the past recalls conducted by Hyundai due to the possibility of engine fires and feel[s] as though[] [his or her] vehicle is one of the vehicles affected [b]y the negligence in the manufacturers end."

76.     Upon information and belief, Defendants' customer relations divisions regularly receive and respond directly to customer calls concerning, *inter alia*, product defects. Through these sources, Defendants was made aware of the Defect and had knowledge of the its potential danger. For instance, Plaintiff informed Hyundai of his fire caused by the Defect eleven (11) months prior to Hyundai's recall of his vehicle.

77.     On information and belief, Defendants' customer relations departments, which interact with authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, have received numerous reports compartment fires unrelated to collisions and accidents.[25] Customer relations also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

78.     Defendants' warranty departments similarly review and analyze warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in its vehicles. Defendants dictate that when a repair is made under warranty (or warranty coverage is requested), service centers must provide Defendants with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case Defendants later determines to audit the dealership or otherwise verify the warranty repair. For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to Defendants because Defendants will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

79.     Upon information and belief, Defendants knew or should have known about the Defect and risk of engine compartment fires because of the high number of replacement parts likely ordered from Defendants. All of Defendants service centers are required to order replacement parts, including

---

[25] *See, e.g.*, NHTSA ID Nos.: 10875413, 10993003.

ABS modules and HECUs directly from Defendants. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from Defendants. Defendants routinely monitor part sales reports and are responsible for shipping parts requested by dealerships and technicians. Thus, Defendants have detailed, accurate, and real-time data regarding the number and frequency of replacement part orders. The increase in orders of auto-parts necessary to fix damage caused by engine compartment fires in the Class Vehicles was known to Defendants and should have alerted it to the scope and severity of the engine defect.

80.     Furthermore, the existence of the Defect should not have come as a surprise to Defendants as ABS modules are known to experience issues with sealing and moisture causing dangerous conditions within the component. For example, in 2015, Chrysler announced a recall of 2012-2015 Dodge Journeys due to a defect within the ABS module which allows moisture to enter the component which "could disable the ABS and/or Electronic Stability Control (ESC) system(s)."[26] Nissan announced its own recall of multiple vehicles in 2016, over a defect in its ABS which can leak fluid into the component which "may create an electrical short in the actuator circuit, which in rare instances, may lead to a fire."[27]

81.     In fact, in 2014, Hyundai was fined $17.35 million for failing to timely report a defect in the HECUs found in 2009-2012 Hyundai Genesis which may lead to corrosion and impair brake effectiveness.[28]     NHTSA found that Hyundai knowingly withheld information concerning the dangerous safety defect from vehicle owners and delayed issuing a recall over the defect.

82.     As part of the Consent Decree entered into by Hyundai, it "commit[ed] and agree[ed] to… [make] corporate organizational and process improvements" including the creation of a U.S. Technical Committee to review and make decisions regarding potential safety recalls. The head of the U.S. Technical Committee was also granted "direct access to the board of directors and the Chief Executive Officer ('CEO') of [Hyundai America]."

---

[26] NHTSA Recall No. 15V-675.
[27] NHTSA Recall No. 16V-636.
[28]https://one.nhtsa.gov/About-NHTSA/Press-Releases/Hyundai%E2%80%93agrees%E2%80%93to%E2%80%93pay%E2%80%93$17.35%E2%80%93million%E2%80%93fine (last accessed July 16, 2020).;
https://static.nhtsa.gov/odi/rcl/2013/RCDNN-13V489-9416.pdf (last accessed July 16, 2020).

**F.     Defendants issue inadequate and incomplete Recalls, leaving hundreds of thousands of dangerous Class Vehicles on the road.**

83.     Auto manufacturers are required to file a report with NHTSA within five days of identifying any safety related defects in its vehicles. 49 CFR § 573 *et seq*.  The initial report is required to identify all vehicles "potentially containing the defect" and include "a description of the manufacturer's basis for its determination of the recall population and a description of how the vehicles or items of equipment to be recalled differ from similar vehicles or items of equipment that the manufacturer has not included in the recall." *Id*. § 573.6. Additionally, the report must contain a "description of the defect" and "identify and describe the risk to motor vehicle safety reasonably related to the defect[.]" *Id*.

84.     The purpose of these regulations is obvious: "To facilitate the notification of owners of defective and noncomplying motor vehicles…, and the remedy of such defects and noncompliances, by equitably apportioning the responsibility for safety-related defects and noncompliances with Federal motor vehicle safety standards among manufacturers of motor vehicles[.]" *Id*. § 573.2.

85.     Defendants first acknowledged the existence of the Defect on November 4, 2016, when Kia notified NHTSA that it was recalling 71,704 Kia Class Vehicles, comprised of 2008-2009 Kia Sportage vehicles manufactured August 9, 2007, to May 13, 2009."[29]

86.     Kia described the Defect in its Part 573 Safety Recall Report, stating that "[i]mproper sealing of the HECU's wire harness cover permits salt water to eventually reach the electrical circuit board through corroded connector pins." In its Description of the Safety Risk, Kia warned that "[i]f the HECU circuit board experiences a short circuit, a thermal event can result, including the possibility of an engine compartment fire."

87.     In connection with the Part 573 Safety Recall Report Kia filed a "Chronology" of the events leading up to the 2016 Recall. Kia reported that its Consumer Affairs department received a report on April 19, 2016 of engine fire in a 2008 Sportage which was parked in driveway at the time of the fire. On April 22, 2016, the vehicle was transported to Kia's headquarters in Irvine, California. Within four days, on April 26, 2016, Kia's engineers at its headquarters identified the ABS control module area as the origin of fire.

---

[29] NHTSA Campaign Number: 16V-815.

88.    On May 12, 2016, Kia identified other complaints of "thermal events" and began to evaluate the field data. The following week, Kia and its supplier identified road salt entering and causing corrosion in the ABS module as a "possible contributing factor to thermal incidents."

89.    In June 2016, Kia conducted tests to determine the cause of the ignition and found that "[s]alt water is found to increase conductivity in HECU circuits and lead to possible circuit overload."

90.    Kia waited until September 27, 2016, to make the decision to conduct safety recall to prevent thermal events in areas exposed to heavy salt use. Kia also disclosed that it identified nine consumer assistance complaints regarding thermal events.

91.    While Defendants acknowledged the potentially deadly defect in over 71,000 vehicles, it did not offer to remedy the Defect in all recalled vehicles. Instead, Kia only offered to replace the defective HECUs if a Kia dealer determined that "corrosion is present"; otherwise, Kia Class Vehicle owners were merely offered replacement "connector covers" for their HECUs.

92.    Moreover, the 2016 Recall did not fully disclose that the risk of a spontaneous eruption in the engine compartment was due to the HECU remaining charged at all times—a defect that was not addressed by Kia's proposed remedy.

93.    Next, on January 9, 2018, Hyundai notified NHTSA that it was "recalling certain 2006-2011 Hyundai Azera and 2006 Hyundai Sonata vehicles[,] [because] [w]ater may enter the Anti-lock Brake (ABS) Module and result in an electrical short."[30] Hyundai warned that "an electrical short within the ABS Module may cause an engine compartment fire, even when the car is turned off, increasing the risk of an injury." Hyundai identified 87,854 potential affected vehicles.

94.    In its Part 573 Safety Recall Report, Hyundai stated that in December 2016, it "received a report in the Korean market alleging an overheated condition inside the engine compartment around the ABS module."[31] Hyundai claimed that it conducted "a global market analysis but did not identify a trend for this condition." By May 2017, Hyundai stated that it found no design or manufacturing flaw in the ABS module.

---

[30] https://static.nhtsa.gov/odi/rcl/2018/RCAK-18V026-9556.pdf (last accessed July 16, 2020).
[31] https://static.nhtsa.gov/odi/rcl/2018/RCLRPT-18V026-8031.PDF (last accessed July 16, 2020).

95.     In June 2017, Hyundai received a report from the U.S. market alleging illumination of the malfunction indicator light and smoke inside the engine compartment around the ABS module. In November 2017, Hyundai, with the assistance of its supplier, "found evidence of an electrical short inside the ABS module potentially caused by moisture leaking into the ABS module and accelerated by the continuous powered state of the module."

96.     On January 3, 2018, Hyundai issued Recall No. 18V-026 for 87,854 vehicles equipped with faulty ABS modules which may result in dangerous engine compartment fires.

97.     In its Recall Report, Hyundai described the "Defect", "Safety Risk," and "Cause":

Description of the Defect: The subject vehicles are equipped with an Anti-Lock Brake System ("ABS") module that remains powered on when the vehicle is turned off. If moisture has entered the ABS module (such as from water from high pressure car washes), over time an electrical short could occur inside the ABS module.

Description of the Safety Risk: If a short circuit occurs inside the ABS module, there could be an increased risk of an engine compartment fire. The service brakes remain operational.

Description of the Cause: Moisture intrusion into the electronic components of the ABS module can cause a short circuit. Because the ABS module has continuous power, a short circuit may occur while the vehicle is parked, and the ignition switch is turned off.

98.     In contrast to the proposed Defect remedy in the 2016 Recall, this time Hyundai offered to remedy the Defect by "install[ing] a relay in the vehicle's main junction box" which is designed to "power down [the ABS Module] when the ignition switch is turned OFF." This "remedy," however, is equally insufficient as the 2016 Recall remedy. First, the remedy fails to address moisture entering and/or accumulating within the ABS module that allows the components to corrode which leads to a short circuit. Second, it fails to address the corrosion already present in the ABS module that will cause fires when the car is on and the module is knowingly electrified. In fact, on March 22, 2018, a complaint was publicly filed with NHTSA explained that "the recall addresses rewiring the ABS so no power is present in the water leaking ABS module when the vehicle is not operating and parked but does not

40

address failure of the ABS without fire from water leakage when the vehicle is driven."[32]

99.     Hyundai claimed in the 2018 Recall that there had been no reports of accidents or injuries associated with the Defect.  However, this overlooks that Class Vehicle owners had lost use of their cars, and some reported damage to their homes as a result of fires caused by the Defect while the car was parked. Most of all, it ignores the numerous reports of injuries cause to owners and bystanders of the Class Vehicles which were yet to be recalled.

100.    In February 2018, Hyundai issued a Technical Service Bulletin (No. 18-01-009) which described the procedure for installing the relay block into the ABS module electrical circuit.[33]  The Bulletin instructed dealers that they "must perform this Recall Campaign whenever an affected vehicle is in the shop for any maintenance or repair."

101.    By July 29, 2019, Hyundai had inspected 32,381 of the 87,854 defective vehicles subject to the 2018 Recall.[34]

102.    While Hyundai stated in the Recall Report that it "will continue to monitor incidents in the field and will determine at a later date if further investigation is warranted," it failed to recall hundreds of thousands of Class Vehicles that were at risk of eruption due to the same Defect but not included in the 2016 or 2018 Recalls. Moreover, by that time there were already numerous public reports of non-accident engine compartment fires in Class Vehicles which were not included in the 2018 Recall.

103.    Had Hyundai issued a recall for all Class Vehicles at the time of the 2018 Recall, many people would have been taken out of harm's way, including Plaintiff, whose vehicle did not erupt until 2019.

104.    Finally, in February 2020, Defendants announced a recall of an additional 700,000 Class Vehicles due to the Defect.[35]  Specifically, on February 4, 2020, Hyundai recalled approximately 396,025 model year 2007-2011 Elantra vehicles produced between July 14, 2006 and November 23,

---

[32] NHTSA ID No.: 11080896.
[33] https://static.nhtsa.gov/odi/rcl/2018/RCRIT-18V026-8494.pdf (last accessed July 16, 2020).
[34] https://static.nhtsa.gov/odi/rcl/2018/RCLQRT-18V026-0497.PDF (last accessed July 16, 2020).
[35] NHTSA Recall Nos. 20V-061, 20V-088

2010, approximately 33,661 model year 2009-2011 Elantra Touring vehicles produced between October 15, 2008 and December 6, 2010, approximately 41,420 model year 2007-2008 Entourage vehicles produced between February 16, 2006 and June 30, 2008, and approximately 5,005 model year 2007 Hyundai Santa Fe vehicles produced between August 8, 2006 and December 8, 2006. And on February 14, 2020, Kia recalled approximately 228,829 vehicles, comprised of 2006-2010 Kia Sedona vehicles manufactured from June 15, 2005 through July 15, 2009 and certain 2007-2009 Kia Sorento vehicles manufactured from June 15, 2006 through December 15, 2008.

105. Like its 2018 Recall, Hyundai stated in its Part 573 Safety Recall Report[36] that the recalled "vehicles are equipped with an Anti-Lock Brake System ('ABS') module that remains energized when the vehicle is turned off. If moisture enters the electrical circuit of the ABS module a short circuit could gradually develop." Should a short circuit occur in the ABS module, "there could be an increased risk of a 'key-off' engine compartment fire." Hyundai stated that "*[a] specific causality allowing moisture to enter the ABS module electrical circuit has not yet been identified*; however, because the ABS module is continually powered, an electrical short could develop even while the vehicle is turned off." Further, Hyundai proposed the same inadequate "remedy" as in the 2018 Recall, the instillation of a "new relay [which] will power down the ABS module when the vehicle's ignition switch is turned OFF."

106. Similarly, Kia reported in its Part 573 Safety Recall Report[37] that "[w]hen the vehicle is in the key OFF position and parked, the Hydraulic Electronic Control Unit (HECU) remains energized. If moisture enters the HECU, an electrical short circuit could occur even though the vehicle is turned off and parked." Like each of the other Class Vehicles, the Defect created a "safety risk" of an electrical short circuit inside the HECU resulting in "an engine compartment key OFF fire." Further, Kia stated that "[t]he cause of moisture entering the HECU has not yet been ascertained. However, since the HECU is continuously powered, an electrical short may occur while the vehicle is turned off and parked."

107. In the "Chronology" filed by Hyundai with NHTSA the company described "the events

---

[36] https://static.nhtsa.gov/odi/rcl/2020/RCLRPT-20V061-1748.PDF (last accessed July 16, 2020).

[37] https://static.nhtsa.gov/odi/rcl/2020/RCLRPT-20V088-8521.PDF (last accessed July 16, 2020).

leading up to the defect decision:"

- In October 2017, Hyundai Motor America ("HMA") received a claim alleging an engine compartment fire on a 2007 Hyundai Elantra vehicle. HMA inspected the vehicle and confirmed damage consistent with an engine compartment fire. The source of the ignition could not be determined due to the extent of the damage; however, various fuses related to the ABS module were found open indicating the possibility of an internal short. HMA requested the ABS module to be recovered for further analysis. HMA conducted a search of all field information and discovered two additional reports of engine compartment fires on Elantra vehicles. The ABS modules from these incidents were also requested for analysis.

- By November 2017, HMA received two of the three known incident parts. A Quality Information Request ("QIR") was issued by HMA to HMC requesting an analysis of the recovered incident parts for any signs of electrical shorting due to brake fluid or moisture contamination.

- In March 2018, HMA received HMC's recovered parts analysis result. In their analysis, HMC concluded that moisture ingress analysis could not be performed due to the extent of heat damage to the ABS module components. HMC requested additional recovery parts for further analysis.

- From April 2018 to August 2018, HMA continued monitoring incidents in the field. Due to the low rate of vehicle fires and warranty part returns, HMA initiated random recovery of in-use ABS modules for inspection of any precursory signs of moisture ingress or electrical shorting. Four additional ABS modules were recovered and sent to HMC for analysis. HMA received HMC's analysis result in late August 2018. In their analysis, HMC reported that all parts were free of any signs of moisture ingress or electrical shorting.

- From September 2018 to February 2019, HMA continued monitoring incidents in the field and requesting 100% of incident parts for analysis by HMC. During this time, one additional incident part was recovered by HMA and sent to HMC.

- In March 2019, HMC decided to conduct an in-person field survey of both incident and in-use vehicles in the U.S. market due to the low number of available recovery parts to investigate potential root cause(s). A total of eleven vehicles (one incident vehicle and ten in-use vehicles) were surveyed, however, no signs of moisture were found in any of the ABS modules.

- From April 2019 to December 2019, HMC continued to investigate warranty part returns from both the U.S. and domestic markets. In their analysis, HMC observed various part conditions that could potentially lead to moisture ingress into the electrical circuit of the ABS module such as insufficient diagnostic connecter fastening, cracked PCB covers, damaged connectors, and mismatched OEM/aftermarket sub-components; however, no discernible trend relating to a design or manufacturing defect could be found. Despite being unable to identify a consistent mechanism for moisture intrusion, HMC recommended addressing the

condition by depowering the ABS module during the ignition OFF state, similar to prior recall 172. Based on this information, on January 28, 2020, HMA convened its Technical Committee and decided to conduct a safety recall in the U.S. market to address the condition in all affected vehicles.

- In early February 2020, HMA received information of an agency request to Kia Motor America ("KMA") to conduct a recall of certain Kia Sedona and Sorento vehicles addressing a similar condition involving on-board ABS modules. HMC informed HMA that certain Hyundai vehicles containing similar ABS systems as the ones being recalled by KMA may need to be included in the original recall decision made on January 28. Based on this information, HMA re-convened its Technical Committee on February 17, 2020 and decided to expand recall 20V-061 to include these additional vehicles.

108. Kia too filed a "Chronology" supporting its decision to announce the 2020 Recall:

- April 2017-May 2017[:] Kia Motors America, Inc. (KMA) receives engine compartment fire complaint for 2009 Kia Sorento on April 6, 2017. KMA inspects vehicle on May 18, 2017 and identifies origin of fire near engine room fuse/relay box; cause could not be determined.

- July 2018-August 2018 [:] KMA receives complaints of two (2) engine compartment fires involving a 2008 and 2009 Sorento. During this time, KMA conducts broad search of salvage yard vehicles for further investigation. KMA and Kia Motors Corporation (KMC) jointly inspect the available Sorento vehicles. Inspections reveal origin of fire is near area of Hydraulic Electronic Control Unit (HECU) and engine room fuse/relay box. Cause of fire could not be confirmed. Further analysis needed. KMA begins process of recovering parts from inspected vehicles for further evaluation.

- September-November 2018 [:] KMA continues to monitor field incidents; no related fire incidents identified. On November 26, 2018, KMA provides part recovered from prior salvage yard inspection to KMC for further analysis.

- December 2018 [:] KMC and supplier conduct visual and x-ray evaluation of HECU part received from KMA in November 2018 from salvage yard vehicle. HECU connector B+ area severely damaged from fire. Minor corrosion found on one of the ESC connector wires. Corrosion possibly due to moisture intrusion, but manner of intrusion could not be determined.

- January 2019 [:] KMA recovers HECU parts from two (2) Sorento vehicles previously inspected in August 2018 and ships them to KMC for further evaluation. KMC and supplier analyze parts; corrosion of ESC wiring found on one examined part possibly due to moisture intrusion. Examination of second part revealed thermal damage to HECU cover; fire origin suspected to be in relay box area, but cause could not be determined.

- February 2019 [:] KMA notified of a fire incident involving a 2008 Sedona on February 12, 2019. KMA inspects vehicle and finds burn damage of HECU

connector but cause could not be determined. KMA begins process to repurchase vehicle for further evaluation. KMA continues to monitor.

- May 2019-June 2019 [:] KMA notified of fire incident involving a 2007 Sedona on May 7, 2019. KMA inspects vehicle on June 27, 2019. Origin of fire in area of HECU but cause could not be determined. KMA works to collect parts for further examination by KMC.

- July 2019-November 2019 [:] KMA continues to monitor incidents and receives 2009 Sorento engine compartment fire claim on August 6, 2019. KMA subsequently inspects vehicle on October 9, 2019 and identifies fire originated in left rear of engine compartment, likely in area near HECU. However, cause could not be determined.

- December 2019-January 2020 [:] KMC engineers and KMA engineers conduct joint inspection at KMA headquarters on December 9, 2019 of two (2) previously repurchased incident vehicles and three (3) HECU parts which had been collected by KMA. Inspection confirms visible thermal damage to HECUs. Further X-ray analysis of HECU conducted by supplier in January showed evidence of a short circuit, possibly related to intrusion of moisture. Source of possible moisture intrusion could not be determined. No identifiable trend relating to a design or manufacturing defect could be found.

- February 10, 2020 [:] As a precautionary measure, KMC decides to conduct a recall of certain Kia Sedona and Sorento vehicles to prevent key OFF engine compartment fires by depowering the HECU when the vehicle is in the ignition key OFF condition. Two (2) Sedona and five (5) Sorento fire related customer complaints. No known injuries related to this condition.

109. Glaringly absent from both of Defendants' Chronologies leading up to the 2020 Recall is any reference of the same Defect found in the 2016 and 2018 Recalls or the fact that the numerous public complaints had been filed by Class Vehicle owners prior to 2017.

110. Furthermore, the 2020 Recall contains the same inadequacies as the 2018 Recall in that it does not attempt to address the risk of moisture entering and/or accumulating in the ABS module and HECUs.

111. The "remedy" also fails to address the risk of engine compartment fires while the car is in operation. This serious fault in Defendants' "remedy" was seemingly acknowledged by Hyundai. Following the announcement of the 2020 Recall, Consumer Reports questioned Michael Stewart, Hyundai's Senior Group Manager, Corporate & Marketing PR, regarding the risk of a short circuit

CLASS ACTION COMPLAINT

occurring in an ABS module while the vehicle is turned on.[38] Mr. Stewart did not deny that Hyundai's proposed remedy alleviated this risk, instead he implied it was the driver's duty to monitor this risk, stating that "[w]hen the vehicle is on, short circuits are preceded by other noticeable symptoms," including a noise or an ABS warning light illuminated on the dashboard.

112.    Accordingly, each of the Class Vehicles remain a present danger to all drivers, owners, and bystanders.

**G.    Defendants falsely claim to offer the best warranty program in the nation.**

113.    Defendants advertise their warranty program as "industry lead[ing]"[39] and "America's Best Warranty."[40] When Plaintiff purchased his vehicle from Hyundai, the "sticker" stated that a "warranty [is] included for your peace of mind." But in reality, Defendants warranty programs bring little comfort to Class Vehicle owners. Despite Defendants' promises, they have consistently evaded their warranty obligations by failing to inform consumers that their vehicles are defective and by refusing to cover damages caused by the Defect.

114.    In many instances, consumers have incurred and will continue to incur expenses for the diagnosis of the Defect (despite such Defect having been contained in the Class Vehicles when manufactured by Defendants), repair and replacement of various vehicle parts as a result of damage caused by the Defect.

115.    Furthermore, a number of Class Members who presented their Class Vehicles to Defendants dealerships because of issues related to the Defect were denied warranty repairs and, instead, were informed that nothing was wrong with their vehicles. As a result, after expiration of the warranty period, Class Members are often forced to pay costly repairs to correct the Defect.

116.    For example, in 2011, following the first reported fire caused by the Defect, the owner of the destroyed 6-month old 2010 Hyundai Elantra Touring reported that Hyundai "refused to replace the

---

[38] https://www.consumerreports.org/car-recalls-defects/hyundai-elantras-recalled-for-fire-risk/ (last accessed July 16, 2020).

[39] https://owners.kia.com/us/en/service-page/warranty.html (last accessed July 16, 2020).

[40] https://www.hyundaiusa.com/us/en/assurance/america-best-warranty (last accessed July 16, 2020).

CLASS ACTION COMPLAINT

vehicle or reimburse [the owner] for any other expenses related to the fire."[41]

117.    In September 2018, an owner of a 2009 Hyundai Elantra "woke up around 5 am to find the Elantra fully engulfed in flames in the front end."[42] The owner then went to a Hyundai dealership where a Hyundai representative stated that the damage was not covered by the warranty, without even inspecting the vehicle.

118.    In April of 2018, an owner of a 2007 Kia Sedona reported to Kia that the engine compartment of their vehicle had suddenly caught fire after being parked for about an hour, which resulted in the total loss of the vehicle.[43] Instead of recalling the vehicle due to the dangerous Defect, Kia told the owner that the fire and loss of the vehicle was "NOT THEIR PROBLEM." That same month, an owner of a 2008 Kia Sorento reported that they were awoken "by [an] EMS to [his or her] car up in flames."[44] The owner reported that the fire department stated that "the fire started behind the steering wheel/dash and that it was an electrical engine fire." After the owner contacted Kia regarding the unexplainable "IT WAS NO WAY IT WAS THEIR PROBLEM AND HAD TO BE A USER ERROR."

119.    In fact, days before Defendants announced the 2020 Recall, Kia denied coverage of a claim caused by the Defect. On February 10, 2020, an owner of a 2007 Kia Sedona reported that the day prior their car suddenly began to smoke under the hood by the HECU.[45] After reporting the fire to Kia, the owner was told "SORRY BUT ITS AN OUT OF POCKET EXPENSE, [THE] CAR IS NOT UNDER WARRANTY AND THERE ARE NO RECALLS."

120.    Since recalling the Class Vehicles, numerous owners reported that Defendants' authorized dealerships were unable to install relay devices because the parts were unavailable.[46]

## V.    TOLLING OF STATUTES OF LIMITATIONS

121.    Any applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff and the members of the Class could

---

[41] NHTSA ID No.: 10398944.
[42] NHTSA ID No.: 11140848.
[43] NHTSA ID No.: 11090369.
[44] NHTSA ID No.: 11089996.
[45] NHTSA ID No.: 11308166
[46] See NHTSA ID Nos.: 11321732, 11320439, 11320416, 11329061.

not have reasonably discovered the true, latent nature of the Defect until shortly before this class action litigation was commenced.

122.    In addition, even after Plaintiff and Class Members contacted Defendants and/or their authorized dealers for vehicle repairs concerning the Defect, they were routinely told by Defendants and/or through their dealers that the Class Vehicles were not defective and/or Defendants were not responsible. As described above, the true cause of the engine compartment fires and short-circuiting in the Class Vehicles is a defect caused by, *inter alia*, the defective design of ABS modules and HECUs which allows moisture to accumulate in the component, and Defendants' design which maintains an electrical charge in those components at all times.

123.    Defendants were and remain under a continuing duty to disclose to Plaintiff and the Members of the Class the true character, quality, and nature of the Class Vehicles, that the manufacturing defect will result in catastrophic engine compartment fires, that they will require costly repairs, pose safety concerns, cause damage to their personal property, and diminish the resale value of the Class Vehicles. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VI.    CALIFORNIA LAW APPLIES TO NATIONWIDE CLAIMS

124.    It is appropriate to apply California law to the nationwide claims because California's interest in this litigation exceeds that of any other state.

125.    Defendant Hyundai America is headquartered in Fountain Valley, California and is the sole entity in the United States responsible for distributing, selling, leasing, and warranting Hyundai vehicles, including the Hyundai Class Vehicles.

126.    Defendant Kia America is headquartered in Irvine, California and is the sole entity in the United States responsible for distributing, selling, leasing, and warranting Kia vehicles, including the Kia Class Vehicles.

127.    Defendants each maintain their customer relations, engineering, marketing, and warranty departments at their corporate headquarters in this judicial district. Defendants' customer relations department is responsible for fielding customer complaints and monitoring customer complaints posted to their respective websites or third-party websites.

128.    Defendants' warranty and engineering departments are both responsible for the decisions to conceal the Defect from Class Members.

129.    Based on the foregoing, such policies, practices, acts, and omissions giving rise to this action were developed in, and emanated from, Defendants' headquarters in this judicial district in California.

130.    As detailed above, Defendants knew or should have known about the Defect through the activities of their divisions and affiliated entities located within California. Accordingly, the State of California has the most significant relationship to this litigation and its law should govern.

## VII.   CLASS ALLEGATIONS

131.    Plaintiff brings this action on his own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3).

> All persons or entities in the United States who are current or former owners and/or lessees of a Hyundai Elantra (model years 2007-2010); Hyundai Elantra Touring (model years 2009-2011); Hyundai Entourage (model years 2007-2008); Hyundai Santa Fe (model year 2007); Hyundai Azera (model years 2006-2011); Hyundai Sonata (model year 2006); Kia Sedona (model years 2006-2010); Kia Sorento (model years 2007-2009); and Kia Sportage (model years 2008-2009) (the "Class").

132.    Excluded from the Class are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the Class definitions based on discovery and further investigation.

133.    <u>Numerosity</u>: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that at least hundreds of thousands of Class Vehicles have been sold and leased in the United States.

134.    <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions

affecting individual Class Members. These common legal and factual questions include, but are not limited to:

    a.   Whether Defendants engaged in the conduct alleged herein;

    b.   Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

    c.   Whether the Class Vehicles were sold with a safety defect;

    d.   Whether Defendants knew of the Defect but failed to disclose the problem and its consequences to their customers;

    e.   Whether a reasonable consumer would consider the Defect or its consequences to be material;

    f.   When Defendants discovered the Defect in the Class Vehicles, and what, if anything, they did in response;

    g.   Whether Defendants should be required to disclose the existence of the Defect;

    h.   Whether Defendants' conduct violates the California Legal Remedies Act, California Unfair Competition Law, and the other statutes asserted herein;

    i.   Whether Plaintiff and Class Members overpaid for their Class Vehicles; and

    j.   Whether Plaintiff and Class Members experienced out-of-pocket losses as a result of the Defect, and if so, how much.

135.   Typicality: Plaintiff's claims are typical of the claims of the Class because Plaintiff purchased a Class Vehicle with the same Defect as did each member of the Class. Furthermore, Plaintiff and all Members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendants' wrongful conduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent Class Members.

136.   Adequacy: Plaintiff is an adequate representative because his interests do not conflict with the interests of the Class that he seeks to represent, he has retained counsel competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

137.   Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and Members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for Members of the Class individually to redress effectively the wrongs done to them. Even if the Members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims, registration records, and database of complaints.

138.   Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## VIII.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT
### (Cal. Civ. Code § 1750, *et seq.*)

139.   Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

140.   Plaintiff brings this claim on behalf of himself and on behalf of the Class.

141.   Defendants are persons as that term is defined in California Civil Code 5 § 1761(c).

142.   Plaintiff and the Class Members are "consumers" as that term is defined in California Civil Code §1761(d).

143.   Defendants engaged in unfair and deceptive acts in violation of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, by the practices described above, and by knowingly and intentionally concealing from Plaintiff and Class Members that the Class Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this

problem). These acts and practices violate, at a minimum, the following sections of the CLRA:

    a.  (a)(2) Misrepresenting       the       source, sponsorship, approval or certification of goods or services;

    b.  (a)(5) Representing that    goods or      services      have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

    c.  (a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

    d.  (a)(9) Advertising goods and services with the intent not to sell them as advertised.

144.    Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

145.    Defendants knew that the Class Vehicles were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

146.    Defendants were under a duty to Plaintiff and the Class Members to disclose the defective nature of the Class Vehicles and the defective nature of the ABS modules and HECUs because:

    a.  Defendants were in a superior position to know the true state of facts about the safety Defect and associated repair costs in the Class Vehicles;

    b.  Plaintiff and the Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had dangerous safety Defect until manifestation of the Defect;

    c.  Defendants knew that Plaintiff and the Class Members could not reasonably have been expected to learn or discover the safety Defect and the associated repair costs that it causes until the manifestation of the Defect; and

    d.  Defendants actively concealed the safety Defect and the associated repair costs by knowingly failing to recall Class Vehicles at an earlier date and denying warranty claims arising from the Defect.

147.    In failing to disclose the Defect and the associated safety risks and repair costs that result from it, Defendants have knowingly and intentionally concealed material facts and breached their duty

to disclose.

148.    The facts concealed or not disclosed by Defendants to Plaintiff and the Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendants' Class Vehicles or pay a lesser price. Had Plaintiff and the Class known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

149.    On or about August 25, 2020, Plaintiff, through undersigned counsel, provided Defendants with notices of their violations of the  CLRA.

150.    Plaintiff and Class Members' injuries were proximately caused by Defendants' fraudulent and deceptive business practices.

151.    Plaintiff and the Class members seek equitable relief, and will amend this claim to seek damages after the notice period.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200)**

152.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein

153.    Plaintiff brings this claim on behalf of himself and on behalf of the Class.

154.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

155.    Defendants have engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff and the Class Members that the Class Vehicles suffer from a defect (and the costs, safety risks, and diminished value of the vehicles as a result of these problems). Defendants should have disclosed this information because they were in a superior position to know the true facts related to the defect, and Plaintiff and Class Members could not reasonably be expected to learn or discover the true facts related to the defect.

156. The defective ABS modules and HECUs constitute a safety issue that triggered Defendants' duty to disclose the safety issue to consumers.

157. These acts and practices have deceived Plaintiff and are likely to deceive the public. In failing to disclose the defect and suppressing other material facts from Plaintiff and the Class Members, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiff and the Class Members. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiff and the Class Members, as it would have been to all reasonable consumers.

158. The injuries suffered by Plaintiff and the Class Members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff and the Class Members should have reasonably avoided.

159. Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code § 2313.

160. Plaintiff seeks to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

### THIRD CAUSE OF ACTION
### VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW
### (Cal. Bus. & Prof. Code § 17500, *et seq.*)

161. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein

162. Plaintiff brings this claim on behalf of himself and on behalf of the Class.

163. California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of

reasonable care should be known, to be untrue or misleading."

164.    Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiff and the other Class Members.

165.    Defendants have violated section 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of their Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

166.    Plaintiff and the other Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiff and the other Class Members relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles. Defendants' representations were untrue because the Class Vehicles are distributed with defective ABS modules and HECUs. Had Plaintiff and the other Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them. Accordingly, Plaintiff and the other Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

167.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' businesses. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

168.    Plaintiff, individually and on behalf of the other Class Members, requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and the other Class Members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

### FOURTH CAUSE OF ACTION
### VIOLATIONS OF THE SONG-BEVERLY ACT
### BREACH OF IMPLIED WARRANTY
### (Cal. Civ. Code §§ 1792, 1791.1, *et seq.*)

169.   Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein

170.   Plaintiff brings this claim on behalf of himself and on behalf of the Class.

171.   At all relevant times hereto, Defendants were the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or should have known of the specific use for which the Class Vehicles were purchased.

172.   Defendants provided Plaintiff and the Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles suffered from an inherent defect at the time of sale that causes the Class Vehicles to experience premature and catastrophic engine compartment fires.

173.   The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the defect.

174.   Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not prematurely and catastrophically fail; and (ii) a warranty that the Class Vehicles would be fit for their intended use – providing safe and reliable transportation – while the Class Vehicles were being operated.

175.   Contrary to the applicable implied warranties, the Class Vehicles, and their ABS modules or HECUs at the time of sale and thereafter were not fit for their ordinary and intended purpose. Instead, the Class Vehicles are defective, including, but not limited to, the defects which maintain an electrical charge in the vehicles ABS module and/or HECU, and allows moisture to enter the component.

176.   Plaintiff and the other Class Members have had sufficient direct dealings with either Defendants or their agents (*e.g.*, dealerships, Consumer Affairs departments, and technical support) to

establish privity of contract between Defendants on one hand, and Plaintiff and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class Members are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiff and each of the other Class Members relied on statements made by Defendants themselves in choosing to purchase or lease a Class Vehicle.

177.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

178.    Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and the other Class Members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

179.    Pursuant to Cal. Civ. Code § 1794, Plaintiff and the other Class Members are entitled to costs and attorneys' fees.

## FIFTH CAUSE OF ACTION
## UNJUST ENRICHMENT

180.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein

181.    Plaintiff brings this claim on behalf of himself and on behalf of the Class.

182.    At all times relevant hereto, Defendants designed, manufactured, produced, marketed, and/or sold the Class Vehicles.

183.    Plaintiff and members of the Class conferred non-gratuitous benefits upon Defendants, without knowledge that the Class Vehicles contained a dangerous safety Defect.

184.    Defendants appreciated, or had knowledge of, the non-gratuitous benefits conferred upon them by Plaintiff and members of the Class.

185.    Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiff and members of the Class, with full knowledge and awareness that, as a result of Defendants' unconscionable wrongdoing, Plaintiff and members of the Class were not receiving product of high quality, nature, fitness or value that had been represented by Defendants and reasonable consumers would have expected.

186.    Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiff and members of the Class under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.

187.    Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiff and members of the Class is unjust and inequitable, Plaintiff and members of the Class are entitled to, and hereby seek disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits in a manner established by the Court.

**SIXTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
**(Cal. Com. Code § 2314)**

188.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein

189.    Plaintiff brings this claim on behalf of himself and on behalf of the Class.

190.    Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

191.    Defendants provided Plaintiff and the other Class members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles and their ABS modules and/or HECUs suffered from the Defect at the time of sale that causes the vehicles to experience premature and catastrophic engine compartment fires. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

192.     Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not experience premature and catastrophic engine compartment fires; and (ii) a warranty that the Class Vehicles and their ABS modules and/or HECUs would be fit for their intended use while the Class Vehicles were being operated or parked.

193.     Contrary to the applicable implied warranties, the Class Vehicles and their ABS modules and/or HECUs at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and the other Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from a defective design(s) and/or manufacturing defect(s).

194.     Defendants knew or had reason to know of these material facts, and wrongfully and fraudulently concealed these material facts from Plaintiff and the Class. Defendants were provided notice of these issues by, *inter alia*, complaints lodged by consumers with NHTSA—which Defendants routinely monitor—before or within a reasonable amount of time after the allegations of the Defect became public.

195.     Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

196.     Plaintiff and the other Class Members have had sufficient direct dealings with either Defendants or their agents (*e.g.*, dealerships, Consumer Affairs departments, and technical support) to establish privity of contract between Defendants on one hand, and Plaintiff and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class Members are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiff and each of the other Class Members relied on statements made by Defendants themselves in choosing to purchase or lease a Class Vehicle.

197.     Plaintiff, on behalf of himself and the Class, seeks monetary damages, treble damages, costs, attorneys' fees, and such other and further relief provided by law and equity.

**SEVENTH CAUSE OF ACTION**
**ALTERNATIVE COUNT FOR**
**VIOLATION OF STATE CONSUMER PROTECTION ACTS**

198.     Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein

199.     Plaintiff brings this alternative cause of action on behalf of himself and on behalf of all similarly situated residents of each of the 50 states for violations of the state consumer protection acts including:

a.     the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. § 45.50.471, et seq.;

b.     the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, et seq.;

c.     the Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, et seq.;

d.     the California Unfair Competition Law, Bus. & Prof. Code §§ 17200, et seq. and 17500, et seq.;

e.     the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq.;

f.     the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. § 6-1-101, et seq.;

g.     the Connecticut Unfair Trade Practices Act, Conn. Gen Stat. Ann. § 42- 110, et seq.;

h.     the Delaware Consumer Fraud Act, 6 Del. Code § 2513, et seq.;

i.     the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, et seq.;

j.     the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, et seq.;

k.     the Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-390, et seq.;

l.     the Hawaii Unfair Competition Law, Haw. Rev. Stat. § 480-2, et seq.;

m.     the Idaho Consumer Protection Act, Idaho Code. Ann. § 48-601, et seq.;

n.     the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1, et seq.;

o.     the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-2, et seq.;

p.   the Kansas Consumer Protection Act, Kan. Stat. Ann. § 50-623, et seq.;

q.   the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, et seq.;

r.   the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, et seq.;

s.   the Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. Tit. 5, § 207, et seq.;

t.   the Maryland Consumer Protection Act, Md. Code Ann. Com. Law, § 13-301, et seq.;

u.   the Massachusetts Regulation of Business Practices for Consumers Protection Act, Mass. Gen Laws Ann. Ch. 93A, et seq.;

v.   the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, et seq.;

w.   the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F, et seq.;

x.   the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407, et seq.;

y.   the Nebraska Consumer Protection Act, Neb. Rev. St. §§ 59-1601, et seq.;

z.   the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 41.600, et seq.

aa. the New Hampshire Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat. § 358-A:1, et seq.;

bb. the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8, et seq.;

cc. the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, et seq.;

dd. the New York Consumer Protection from Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349, et seq.;

ee. the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, et seq.;

ff.  the North Dakota Consumer Fraud Act, N.D. Cent. Code § 51-15, et seq.;

gg. the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, et seq.;

hh. the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15 § 751, et seq.;

ii.  the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, et seq.;

jj.  the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et seq.;

kk. the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-5.2(B), et seq.;

ll.  the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5- 10, et seq.;

mm.  the South Dakota Deceptive Trade Practices and Consumer Protection, S.D. Codified Laws § 37-24-1, et seq.;

nn. the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, et seq.;

oo. the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Code Ann., Bus. & Con. § 17.41, et seq.;

pp. the Utah Consumer Sales Practices Act, Utah Code. Ann. § 13-11-175, et seq.;

qq. the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, et seq.;

rr.  the Virginia Consumer Protection Act of 1977, Va. Code Ann. § 59.1-199, et seq.;

ss.  the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010, et seq.;

tt.  the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A, et seq.;

uu. the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, et seq.; and

vv. the Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-101, et seq.

200.   The acts, practices, misrepresentations and omissions by Defendants described above, and Defendants' dissemination of deceptive and misleading advertising and marketing materials in connection therewith, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes.

201.   Defendants' acts and practices created a likelihood of confusion or of misunderstanding and misled, deceived, or damaged Plaintiff and members of the Class in connection with the sale or advertisement of the Class Vehicles. Defendants' conduct also constituted the use or employment of deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with  the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged in violation of each of the above-enumerated statutes.

202.   Plaintiff, on behalf of himself and the other Class Members, seeks monetary damages,

treble damages and such other and further relief as set forth in each of the above enumerated statutes.

## EIGHTH CAUSE OF ACTION
## ALTERNATIVE COUNT FOR
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

203.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein

204.    Plaintiff brings this alternative cause of action on behalf of himself and on behalf of all similarly situated residents of each of the 50 states for violations of the following statutes:

    a.   Alaska Stat. § 45.02.314;

    b.   Ark. Code. Ann. § 4-2-314;

    c.   Cal. Civ. Code, § 1792 and Cal. Comm. Code § 2314;

    d.   Colo. Rev. Stat. § 4-2-314;

    e.   Del. Code Ann. Tit. 6, § 2-314;

    f.   D.C. Code § 28:2-314;

    g.   Fla. Stat. § 672.314;

    h.   Ga. Code Ann. § 11-2-314;

    i.   Haw. Rev. Stat. § 490:2-314;

    j.   810 ILCS 5/1-101, et seq.;

    k.   Ind. Code Ann. § 26-1-2-314;

    l.   Iowa Code § 554.2314;

    m.   Kan. Stat. Ann. § 84-2-314;

    n.   La. Civ. Code Ann. Art. § 2520;

    o.   Me. Rev. Stat. tit. 11, § 2-314;

    p.   Md. Code Ann., Com. Law § 2-314;

    q.   Mass. Ann. Laws Ch. 106, § 2-314;

    r.   Michigan Code § 440.2314;

    s.   Minn. Stat. § 336.2-314;

    t.   Miss. Code Ann. § 75-2-314;

u.  Mo. Rev. Stat. § 400.2-314;

v.  Mont. Code Ann. § 30-2-314;

w.  Neb. U.C.C. § 2-314;

x.  Nev. Rev. Stat. U.C.C. § 104.2314;

y.  N.H. Rev. Ann. § 382-A:2-314;

z.  N.J. Stat. Ann. § 12A:2-314;

aa. N.M. Stat. Ann. § 55-2-314;

bb. N.D. Stat. § 41-02-314;

cc. Okla. Stat. tit. 12A § 2-314;

dd. 13 Pa. C.S. § 2314;

ee. R.I. Gen. Laws § 6A-2-314;

ff.  S.C. Code Ann. § 36-2-314;

gg. S.D. Stat. § 57A-2-314;

hh. Tex. Bus. & Com. Code Ann. § 2-314;

ii.  Utah Code Ann. § 70A-2-314

jj.  Vt. Stat. Ann. 9A § 2-314;

kk. Va. Code Ann. § 8.2-314;

ll.  W. Va. Code § 46-2-314; and

mm. Wyo. Stat. § 34.1-2-314.

205.   Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

206.   Under the above statutes, a warranty of merchantability is implied in every contract for the sale of goods, *i.e.*, that the product is fit for the ordinary purposes for which it is used. This implied warranty included, among other things: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not experience premature and catastrophic engine compartment fires; and (ii) a warranty that the Class Vehicles and their ABS modules and/or HECUs would be fit for their intended use while the

64

Class Vehicles were being operated or parked. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles and their ABS modules and/or HECUs suffered from the Defect at the time of sale that causes the vehicles to experience premature and catastrophic engine compartment fires. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

207. Defendants knew or had reason to know of these material facts, and wrongfully and fraudulently concealed these material facts from Plaintiff and the Class. Defendants were provided notice of these issues by, *inter alia*, complaints lodged by consumers with NHTSA—which Defendants routinely monitor—before or within a reasonable amount of time after the allegations of the Defect became public.

208. Plaintiff and the other Class Members have had sufficient direct dealings with either Defendants or their agents (*e.g.*, dealerships, Consumer Affairs departments, and technical support) to establish privity of contract between Defendants on one hand, and Plaintiff and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class Members are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiff and each of the other Class Members relied on statements made by Defendants themselves in choosing to purchase or lease a Class Vehicle.

209. On or about August 25, 2020, Plaintiff provided Defendants with notice of their breach of implied warranties under any states where such notice is required.

210. Defendants' breach of implied warranty proximately caused Plaintiff and the other Class Members to suffer damages.

211. Plaintiff, on behalf of himself and the Class, seeks monetary damages, treble damages, costs, attorneys' fees, and such other and further relief provided by law and equity.

## IX.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, respectfully requests that this Court:

a.     Certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's counsel as Class Counsel;

b.     Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff and Class Members with appropriate curative notice regarding the existence and cause of the engine defect;

c.     Award Plaintiff and Class Members actual, compensatory, general, special, incidental, statutory, punitive, and consequential damages, costs, and disgorgement in an amount to be determined at trial;

d.     Award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e.     Award pre- and post-judgment interest at the maximum legal rate; and

f.     Grant all such other relief as is just and proper.

## X.   DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all claims so triable.

Dated:  August 25, 2020

By: /s/ Jennifer A. Lenze
Jennifer A. Lenze, CA Bar # 246858
Amanda D. McGee, CA Bar # 282034
**LENZE LAWYERS, PLC.**
1300 Highland Avenue, Suite 207
Manhattan Beach, CA 90266
Telephone: (310) 322-8800
Facsimile: (310) 322-8811
jlenze@lenzelawyers.com
mcgee@lenzelawyers.com

Elizabeth A. Fegan (*pro hac vice* to be filed)
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Phone: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Jonathan D. Lindenfeld (*pro hac vice* to be filed)
FEGAN SCOTT LLC
140 Broadway, 46th Floor
New York, NY 10005
Phone: 332.216.2101
Fax: 917.725.9346
jonathan@feganscott.com

*Attorneys for Plaintiff and*
*Proposed Class Counsel*

CLASS ACTION COMPLAINT